UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED SERVICE WORKERS UNION
LOCAL 339, IUJAT,

                Plaintiff,               21 Civ. 5469 (KPF)

    - against -

THE CITY OF NEW YORK,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

Robert J. Anello
Edward M. Spiro
Jacob W. Mermelstein
Curtis B. Leitner

MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.
565 Fifth Ave.
New York, NY 10017
(212) 856-9600

*Attorneys for Plaintiff United Service Workers
Union Local 339, IUJAT*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND .................................................................................................... 3

   I.    NEW YORK CITY PASSES LOCAL LAW 55, PROVIDING BIC WITH THE AUTHORITY TO REGULATE UNIONS IN THE TRADE WASTE INDUSTRY IN AN AREA ALREADY REGULATED BY CONGRESS ............................................... 4

   II.   BIC PROMULGATES RULES IMPOSING REGISTRATION AND DISCLOSURE REQUIREMENTS ON TRADE WASTE UNIONS AND UNION OFFICERS IN CONTRAVENTION OF THE FEDERAL SCHEME ..................................................... 6

   III.  BIC PROMULGATES ADDITIONAL IMPROPER REQUIREMENTS ON APPLICATION FORMS ............................................................................................ 7

LEGAL STANDARD ............................................................................................ 9

ARGUMENT ..................................................................................................... 10

   I.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS ...................................... 10

       A.   The Ordinance, the Implementing Rules, and BIC's Registration Forms are Preempted by Federal Labor Law ......................................................................... 10

           1.   Limited Congressional Carve-Outs To Preemption Do Not Apply Because the Ordinance Is Not a "State" Law within the Meaning of the LMRDA ... 13

              i.   The Terms of the LMRDA Reflect Congress's Intent to Restrict Union Officer Regulation to the Federal and State Governments .................... 13

              ii.  Applying the LMRDA's Preemption Carve-Outs to Local Governments Would Impede Federal Labor Law Policy ............................................. 15

           2.   The Ordinance and BIC's Implementation Infringes upon Section 7 Rights and Impairs the Effectiveness of Unions as Collective Bargaining Agents ..................................................................................................... 19

       B.   The Ordinance Violates the New York State Constitution By Infringing on Employees' Right to Bargain Through Representatives of Their Own Choosing ........................................................................................................ 22

       C.   The Application Forms Violate the United States and New York State Constitutions ..................................................................................................... 24

           1.   The Release Authorization Forms Violate Local 339's and Its Officers' Privacy Rights ....................................................................................... 24

           2.   The Release Authorization Forms Impose an Unconstitutional Condition Because BIC Places a Condition on Receipt of a Benefit that Violates the Recipients' Constitutional Rights ............................................................ 28

3. The Onerous Application Forms Violate the New York City Administrative Procedure Act................................................................................. 29

II. LOCAL 339, ITS OFFICERS, AND ITS MEMBERS WILL BE IRREPARABLY HARMED ABSENT A PRELIMINARY INJUNCTION............................................. 31

III. THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR OF A PRELIMINARY INJUNCTION .................................................................. 33

CONCLUSION....................................................................................................... 34

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*5 Borough Pawn, LLC v. City of New York,*
640 F. Supp. 2d 268 (S.D.N.Y. 2009) ................................................................. 27

*Airbnb, Inc. v. City of New York,*
373 F. Supp. 3d 467 (S.D.N.Y. 2019) ................................................................. 26

*Alliance for Open Society Int'l, Inc. v. U.S. Agency for Int'l Dev.,*
651 F.3d 218 (2d Cir. 2011) ................................................................................ 28

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.,*
880 F. Supp. 2d 456 (S.D.N.Y. 2012) ................................................................... 9

*Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees v. Lockridge,*
403 U.S. 274 (1971) ............................................................................................ 11

*Arizona v. Gant,*
556 U.S. 332 (2009) ............................................................................................ 24

*Bhd. of R.R. Trainmen v. Virginia ex rel. Va. State Bar,*
377 U.S. 1 (1964) ................................................................................................ 20

*Brenntag Int'l Chems., Inc. v. Bank of India,*
175 F.3d 245 (2d Cir. 1999) ................................................................................ 31

*Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Loc. 54,*
468 U.S. 491 (1984) ............................................................................. 13, 21, 23

*Camara v. Mun. Court of City of San Francisco,*
387 U.S. 523 (1967) ............................................................................................ 24

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,*
598 F.3d 30 (2d Cir. 2010) ............................................................................ 10, 34

*City of Los Angeles v. Patel,*
135 S. Ct. 2443 (2015) ............................................................................ 24, 25, 26

*Council of City of New York v. Dep't of Homeless Servs. of City of New York,*
22 N.Y.3d 150 (2013) ............................................................................ 29, 30, 31

*Domanick v. Triboro Coach Corp.,*
18 N.Y.S.2d 960 ................................................................................................. 22

*Entergy Nuclear Indian Point 2, LLC v. New York State Dep't of State*,
130 A.D.3d 1190 (3d Dep't 2015) ................................................................ 30, 31

*Figueroa v. Foster*,
864 F.3d 222 (2d Cir. 2017) ...................................................................... 10, 12

*Int'l Bhd. Of Elec. Workers v. Foust*,
442 U.S. 42 (1979) .......................................................................................... 20

*Garner v. Teamsters Local Union No. 776*,
346 U.S. 485 (1953) ........................................................................................ 11

*Golden State Transit Corp. v. Los Angeles*,
493 U.S. 103 (1989) ........................................................................................ 10

*Healthcare Ass'n of New York State, Inc. v. Pataki*,
471 F.3d 87 (2d Cir. 2006) ................................................................ 11, 13, 21

*Hernandez v. New York*,
173 A.D.3d 105 (N.Y. App. Div. 3d Dep't 2019) ...................................... 22, 23

*Hill v. Florida*,
325 U.S. 538 (1945) .................................................................................. 12, 22

*Hirschfeld v. Stone*,
193 F.R.D. 175 (S.D.N.Y. 2000) ..................................................................... 32

*Hohn v. United States*,
524 U.S. 236 (1998) ........................................................................................ 15

*Hotel Emps. & Rest. Emps. Int'l Union v. Nevada Gaming Comm'n*,
984 F.2d 1507 (9th Cir. 1993) ................................................................... 13, 21

*In re Grand Jury Subpoena, JK-15-029*,
828 F.3d 1083 (9th Cir. 2016) ........................................................................ 25

*Int'l Union of Operating Eng'rs Local 399 v. Vill. of Lincolnshire*,
905 F.3d 995 (7th Cir. 2018) ................................................... 15, 16, 17, 18

*Katz v. United States*,
389 U.S. 347 (1967) ........................................................................................ 24

*Kentucky State AFL-CIO v. Puckett*,
391 S.W.2d 360 (Ky. 1965) ....................................................................... 17, 18

*Koontz v. St. Johns River Water Mgmt. Dist.*,
570 U.S. 595 (2013) ........................................................................... 28, 29, 32

*Liberty Coins, LLC v. Goodman*,
   880 F.3d 274 (6th Cir. 2018) .......................................................................... 26, 27

*Local 186, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Brock*,
   812 F.2d 1235 (9th Cir. 1987) .......................................................................... 20

*Local 926, Int'l Union of Operating Eng'rs v. Jones*,
   460 U.S. 669 (1983) .......................................................................................... 10

*Lynch v. New York City Civilian Complaint Rev. Bd.*,
   183 A.D.3d 512 (1st Dep't 2020) ..................................................................... 30

*Marshall v. Barlow's, Inc.*,
   436 U.S. 307 (1978) .......................................................................................... 24

*Metro. Milwaukee Ass'n of Com. v. Milwaukee Cnty.*,
   431 F.3d 277 (7th Cir. 2005) ............................................................................ 21

*Mitchell* v. *Cuomo*,
   748 F.2d 804 (2d Cir. 1984) ............................................................................. 32

*Mullins v. City of New York*,
   626 F.3d 47 (2d Cir. 2010) ............................................................................... 31

*Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Serv.*,
   604 F. Supp. 2d 665 (S.D.N.Y. 2009) .............................................................. 32

*New Mexico Fed'n of Labor v. City of Clovis*,
   735 F. Supp. 999 (D.N.M. 1990) ................................................................ 17, 18

*NLRB v. Nash-Finch Co.*,
   404 U.S. 138 (1971) .................................................................................... 11, 16

*Ordonez v. City of New York*,
   110 N.Y.S.3d 222 (N.Y. Sup. Ct. 2018) .......................................................... 30

*People v. Scott*,
   79 N.Y.2d 474 (1992) .................................................................................. 27, 28

*Perry v. Sindermann*,
   408 U.S. 593 (1972) (1972) .............................................................................. 28

*Quill v. Eisenhower*,
   113 N.Y.S.2d 887 (Sup. Ct. N.Y. Cnty. 1952) ................................................ 22

*San Diego Building Trades Council v. Garmon*,
   359 U.S. 236 (1959) ............................................................................ 11

*Sanitation & Recycling Indus., Inc. v. City of New York*,
   107 F.3d 985 (2d Cir. 1997) .............................................................. 4

*Schwartfigure v. Hartnett*,
   83 N.Y.2d 296 (1994) ........................................................................ 31

*Soldal* v. *Cook County*,
   506 U.S. 56 (1992) .............................................................................. 24

*Speiser v. Randall*,
   357 U.S. 513 (1958) ..................................................................... 28, 29

*United Automobile Workers v. Hardin County*,
   842 F.3d 407 (6th Cir. 2016) ........................................................... 16

*Williams v. Taylor*,
   529 U.S. 362 (2000) .......................................................................... 15

*Winter* v. *Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................ 9

*Wis. Dep't of Indus., Labor & Human Relations v. Gould, Inc.*,
   475 U.S. 282 (1986) .................................................................. 10, 11

### Statutes, Rules, and Other Authorities

18 U.S.C. § 1961 ................................................................................... 6

28 U.S.C. § 1367 ................................................................................... 2

29 U.S.C. § 164(b) .............................................................................. 15

29 U.S.C. § 151 .................................................................................... 12

29 U.S.C. § 152(5) ............................................................................... 3

29 U.S.C. § 157 ................................................................. 2, 10, 12, 21

29 U.S.C. § 402(b) .............................................................................. 14

29 U.S.C. § 402(e) .............................................................................. 14

29 U.S.C. § 411(a)(2) .......................................................................... 20

29 U.S.C. § 504 ........................................................................................ 2, 10

29 U.S.C. § 504(a) ........................................................................................ 13

29 U.S.C. § 524a ................................................................ 14, 16, 17, 18, 19

29 U.S.C. § 523(a) ............................................................. 13, 16, 17, 18, 19

N.Y. Constitution, Article I, Section 12 ............................................ 24, 27, 28

N.Y. Constitution, Article I, Section 17 ............................................ 2, 22, 23

N.Y. Penal Law § 160.10 ............................................................................. 6

NYC Admin. Code § 16-504(i) ................................................................... 5

NYC Admin. Code § 16-505(c)-(d) ............................................................ 5

NYC Admin. Code § 16-509(g) ................................................................... 6

NY City Charter § 1043 ............................................................................ 29

NY City Charter § 1041(5) ....................................................................... 30

NY City Charter § 1041(5)(b)(ii) .............................................................. 30

The *Ossification of American Labor Law*,
102 Colum. L. Rev. 1527 (2002) ............................................................. 11

*2012 Census of Governments, Individual State Descriptions*,
U.S. Census Bureau (2013)...............................................................................18

# PRELIMINARY STATEMENT

Purporting to support what it deems are "good unions" and oversee which unions it deems are "legitimate,"[1] the City of New York (the "City") has constructed an insidious, onerous, and invasive regulatory scheme that is preempted by federal law and the New York State Constitution because it improperly discourages *any* union from representing trade waste industry workers; restricts the federally protected rights of workers to bargain collectively through representatives of their own choosing; authorizes a City agency to disqualify duly elected union officers or agents on grounds unknown under federal law; burdens and penalizes conduct of union members and officers in violation of federal and state law; affords a City agency virtually unfettered discretion to invade the privacy of unions and their officers; and restricts the right of union officials to associate with members of their own union.[2] The ordinance, Local Law 55 of 2019 (the "Ordinance"), and the Business Integrity Commission's ("BIC") implementation of that Ordinance,[3] require unions representing workers in the trade waste industry to register with BIC by July 1, 2021, and mandate extensive disclosures by unions and their officers—including authorizing BIC secretly to access, *inter alia,* union representatives' private text messages, internet search histories, personal tax returns, and health records. The Ordinance further authorizes BIC to disqualify a person from holding office in a

---

[1] Transcript of City Council Meeting (Feb. 28, 2019), at 35 (statement of Council Speaker Corey Johnson), 45 (statement of Councilmember Antonio Reynoso), annexed as Exhibit 4 to the Declaration of Jacob Mermelstein ("Mermelstein Decl."), dated July 15, 2021, filed herewith.

[2] In a Stipulation and Order dated July 6, 2021, the Court authorized the parties to file initial briefs not exceeding 35-pages in length. *See* Docket Entry 12.

[3] A copy of the Ordinance (as codified in New York City Administrative Code Title 16-A), and BIC's implementing regulations (as codified in Title 17, Chapter 1 of the Rules of the City of New York) are annexed as Exhibits 1 and 2 to the Declaration of Jacob Mermelstein.

labor union and to impose monetary penalties based on a failure to comply.

A preliminary injunction is warranted under the United States Constitution, the New York Constitution, and state and federal law, all of which provide powerful safeguards against precisely this sort of government overreach.  As explained below, the plaintiff is likely to succeed in demonstrating that the Ordinance and BIC's implementation of the Ordinance are unlawful.  The Ordinance and BIC's implementation infringe on union members' right to select their labor representatives and, therefore, are preempted by the National Labor Relations Act ("NLRA") and barred by the New York State Constitution—both of which guarantee workers the right to "bargain collectively through representatives of their own choosing."  29 U.S.C. § 157; N.Y. Constitution, Article I, Section 17.[4]  The Ordinance and BIC's role thereunder establish new standards for union officer disqualification that invade the U.S Department of Labor's ("DOL") role under the Labor–Management Reporting and Disclosure Act ("LMRDA"), which includes investigating and enforcing federal laws defining when union officers or agents may be disqualified from holding office or servicing a labor union. 29 U.S.C. § 504.  Moreover, the Ordinance and its implementation violate the federal and New York State constitutions by infringing on the union's and the union's representatives' privacy rights, and constitute an unconstitutional condition.  Additionally, the application forms promulgated by BIC for unions and union officers violate the New York City Administrative Procedures Act because those forms were not a part of the requisite notice-and-comment procedure and mandate disclosures in excess of the Ordinance or BIC's own rules.

Without immediate judicial intervention, Local 339, its officers, and its members will

---

[4] This Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

sustain irreparable harm—including the impairment of the right of Local 339's members to bargain collectively through representatives of their choosing, disqualification of its officers who are unwilling to waive their state and federal constitutional rights, damage to the ongoing collective bargaining relationship between Local 339 and its members, and the potential for members to lose hard-earned benefits and collective bargaining protections.  Given the threat of irreparable injury to Local 339, its officers and its members, the Court should preliminarily enjoin the Ordinance and its implementation pending final judgment in this action.  Because the City will not be harmed by a temporary preservation of the *status quo*, the balance of the equities and the public interest further support the issuance of a preliminary injunction in this case.

Finally, since the City has already agreed to stay enforcement of the Ordinance and its implementation as to Local 339 and its affiliated locals pending a hearing on plaintiff's motion, Mermelstein Decl. ¶ 8; Docket Entry 5, the City cannot credibly assert that it will be prejudiced by a limited extension of the stay until the Court renders a decision.  Given the threat of irreparable injury to Local 339, its officers, and its members, the Court should extend the parties' agreed-upon stay until it adjudicates this motion.

## BACKGROUND

Plaintiff Local 339 is a voluntary, unincorporated association and is a "labor organization" as defined in Section 2(5) of the NLRA, as amended, 29 U.S.C. § 152(5).  Local 339 is one of numerous local unions affiliated with the United Service Workers Union, a national union representing over 20,000 workers in a wide range of industries, and the International Union of Journeymen and Allied Trades ("IUJAT"), an international union.  (Barry Decl. ¶ 3.)[5]  IUJAT was established in 1874, and is among the oldest labor organizations in the United States.

---

[5] Citations to "Barry Decl." refer to the Declaration of Kevin Barry, dated July 15, 2021.

(*Id.*)

## I.  NEW YORK CITY PASSES LOCAL LAW 55, PROVIDING BIC WITH THE AUTHORITY TO REGULATE UNIONS IN THE TRADE WASTE INDUSTRY IN AN AREA ALREADY REGULATED BY CONGRESS

Since 1956, New York City has required commercial establishments to contract with private sanitation businesses (also known as "trade waste" companies) for refuse removal. *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 990 (2d Cir. 1997).  In 1996, after an investigation of the trade waste industry, the New York City Council adopted Local Law 42 of 1996 ("Local Law 42").  *Id.*  Local Law 42 created the predecessor agency to BIC to control the "corrupting influence" of organized crime on that industry and gave BIC oversight by registering and regulating employers (and workers) in the industry.  Local Law 42, § 1.

Neither Local Law 42, as adopted in 1996, nor any regulations implemented by BIC or its predecessors under that law, imposed any obligations on unions representing workers in the industry, or on officers of such unions.  On February 28, 2019, however, the New York City Council passed Local Law 55 of 2019, which was signed into law by Mayor Bill de Blasio on March 18, 2019.[6]  The Ordinance amended New York City Administrative Code, Title 16-A, Chapter 1, to provide BIC with the authority to regulate labor unions representing employees in the trade waste industry.  According to the bill's sponsor, New York City Council Member Antonio Reynoso, the Ordinance was intended to empower BIC to eradicate from the industry supposed "sham unions," *i.e.*, unions that, in the view of some local politicians, were overly

---

[6] *See Legislation Detail 2019/055, Trade Waste Industry Labor Unions*, New York City Council, (hereinafter, "*Local Law 55 of 2019, Legislative History*"), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3830902&GUID=1555669D-54C3-4D8D-BD16-93422E256BFF&Options=&Search (last visited on July 12, 2021).

conciliatory toward management, and insufficiently aggressive in advocating for their members' interests.[7] Despite congressionally mandated oversight of this area, Councilmember Reynoso stated that the Ordinance was designed to allow BIC to "learn a great deal about who runs the union, and we can disqualify officials who should not be involved," such as representatives of unions that are not "good for the company and good for the workers." Mermelstein Decl. Ex. 3 at 15-16, 69. Most recently, on June 17, 2021, Councilmember Antonio Reynoso, who championed the legislation from its inception, reinforced the improper purpose and effect of the law by stating that it purportedly was "tailored to address" the "issues of company-controlled unions in the putrescible [*i.e.*, disposable] waste industry."[8]

The City Ordinance requires that unions representing trade waste industry workers register with BIC, and that such unions and their officers disclose information to BIC, including the names of the union's officers, all prior criminal convictions of such officers, and all pending civil actions to which an officer is a party. NYC Admin. Code § 16-505(c)-(d). The City Ordinance additionally authorizes BIC to "issue and establish standards for the registration of labor unions or labor organizations representing or seeking to represent employees directly involved in the collection, removal, transportation or disposal of trade waste and for suspending or disqualifying officers of such unions or organizations." *Id.* § 16-504(i). Under the City Ordinance, union officers may be disqualified from holding office if, *inter alia,* they fail to

---

[7] Mermelstein Decl. Ex. 3 (Public Hearing of the Committee on Sanitation and Solid Waste Management of the New York City Council, dated January 29, 2019), at 5-6.

[8] Public Hearing of the Committee on Sanitation and Solid Waste Management of the New York City Council (June 17, 2021) (statement of Councilmember Antonio Reynoso at recorded hearing), https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=872102&GUID=A1DEE69E-00A2-4000-B4A6-6CBD5754ED54&Options=ID|Text|&Search=putrescible (last visited July 12, 2021).

provide information requested by BIC, or they "associated with a person who has been convicted of a racketeering activity" or "associated with any member or associate of an organized crime group," when the officer "knew or should have known" of the prior convictions or associations of such person.  *Id.* § 16-509(g)(iv)-(v).[9]

## II.   BIC PROMULGATES RULES IMPOSING REGISTRATION AND DISCLOSURE REQUIREMENTS ON TRADE WASTE UNIONS AND UNION OFFICERS IN CONTRAVENTION OF THE FEDERAL SCHEME

Pursuant to its authority under the City Ordinance, BIC promulgated rules (the "Rules") through notice-and-comment rulemaking and a public hearing.  *See* Title 17, Chapter 1 of the Rules of the City of New York.  The City Rules became effective on July 23, 2019.  *Id.*  Sections 1-01 through 8-01 of the Rules impose requirements for union registration, require disclosures by unions and union officers, and permit BIC to disqualify union officers and impose financial penalties.  Rules, §§ 1-01 to 8-01.  For example, the Rules require that all unions representing workers in the trade waste industry register with BIC, and require that as a condition of registration, unions and their officers disclose, among other things:

- The names of all officers and agents of the union during the preceding five years;

- All civil or criminal actions pending against such union or any officer in any jurisdiction;

- All criminal convictions of any officer of such union (excluding juvenile adjudications and certain other categories of conviction for which disclosure is barred by New York law);

- All criminal or civil investigations of any officer of such union during the preceding five years wherein the officer was the subject of the investigation or received a subpoena;

- All civil or administrative proceedings to which the union has been a party

---

[9] The City Ordinance defines "racketeering activity" as "including but not limited to" any predicate offense under RICO, 18 U.S.C. § 1961 *et seq.*, or section 160.10 of the N.Y. Penal Law. NYC Admin. Code § 16-509(g).

involving allegations of racketeering;

- All trade waste companies operating in New York City at which the union represents or seeks to represent employees directly involved in the collection, removal, transportation, or disposal of trade waste.

Rules, § 2-04(d). The City Rules further require that in the event that the information disclosed to BIC changes at any time after submission to BIC, unions and their officers have an ongoing obligation to notify BIC within ten business days after the change occurs. Rules, § 2-05(c).

## III. BIC PROMULGATES ADDITIONAL IMPROPER REQUIREMENTS ON APPLICATION FORMS

On or about June 23, 2019, Local 339 received a letter from BIC that directed Local 339 and its officers to complete and submit to BIC a registration application form and an officer disclosure form (collectively, the "application forms"). (Barry Decl. ¶ 13.) BIC directed that the application forms be submitted to BIC by October 14, 2019. (*Id*.) BIC did not, however, include the application forms in the notice and comment process when promulgating the City Rules.[10] Between September 2019 and February 2020, multiple labor unions, including Local 339, communicated legal concerns to BIC and local elected officials concerning the City Ordinance and its implementation. (Barry Decl. ¶ 15.) In response, BIC agreed to multiple extensions to the deadline for submitting the application forms. (*Id.* ¶ 16.) On February 18, 2020, BIC extended the deadline to March 31, 2020, and provided revised application forms to Local 339. (*Id.*).

The application forms, as revised, require disclosures and waivers that go well beyond the disclosures required by the City Ordinance and the Rules. (*See* Barry Decl. Exs. B & C.). Most significantly, the application forms purport to require Local 339 and each of its officers to

---

[10] Mermelstein Decl. Ex. 5 (The City Record, BIC Notice (June 7, 2019)).

execute a "Release Authorization," authorizing BIC to obtain "any and all information," from any source, without regard to the relevance or privacy interests implicated by such information. (Barry Decl. Ex. B at 12 & Ex. C at 6.)[11] This language is not limited by subject matter: if signed, the union and its representatives will grant BIC access to "any and all information" they possess. Moreover, signatories to BIC's form are required to authorize the release of "any and all information" from third parties, "includ[ing], but . . . not limited to":

> accountants, attorneys, banks, bookkeepers, common carriers, courts, credit reporting companies, data systems management companies, educational institutions, employee benefits managers, employees of the applicant, employers of the applicant's principal(s), financial institutions, internet service providers, investigative firms, investment firms, labor unions, law enforcement agencies, media companies, motor vehicle departments, pension funds, probation departments, selective service boards, taxing authorities, telecommunications companies and utilities.

(Barry Decl., Ex. B at 12 & Ex. C at 6.). The Release Authorizations also require that unions and their officers expressly waive any right to be notified of, and have an opportunity to object to, BIC's request to third parties for such information. (*Id.*)

The application forms also purport to require disclosure of an assortment of other information that is not required by, or is broader in scope than, the disclosures required by the Ordinance or the Rules. By way of example, the application forms mandate disclosure of the names of every employee of the union (Barry Decl. Ex. B at 8), whereas the City Ordinance and Rules contain no such requirement.

Throughout 2020, BIC granted a series of further extensions to the application deadlines,

---

[11] Citations to page numbers of exhibits treat each exhibit as having sequentially numbered pages. For example, the final page of Exhibit B (BIC's labor union "Registration Application") is cited herein as page 12, although it bears a page number of 8 because the pagination in the original restarts midway through that document.

which effectively held the implementation of Local Law 55 in abeyance. (Barry Decl. ¶ 17).

Most recently, on January 21, 2021, BIC extended the deadline for unions and their officers to

submit application forms until July 1, 2021.  (*Id.*).

During this period, Local 339 continued to communicate its legal concerns to BIC and

local elected officials in an effort to secure repeal or modification of the City Ordinance and

BIC's implementation.  (*Id.* ¶ 18).  In June 2021, disregarding Local 339's concerns, the City

Council proposed an amendment to the Ordinance that did not address any of the concerns raised

by Local 339 regarding the legal flaws with the Ordinance and its implementation—including

preemption, the violation of constitutional rights, and procedural defects.  The amendment,

which exempts the trade waste workers of Teamsters Local 282, a competitor of Local 339, was

passed by the City Council on June 17, 2021.  Notwithstanding Local 339's persistent efforts

over approximately the last year and a half, which included highlighting numerous legal defects

with the City Ordinance and its implementation, the City and BIC refused to modify the law to

conform with constitutional and legal requirements. (*Id.* ¶¶ 18-20).

On June 23, 2021, the City agreed to stay enforcement of Local Law 55 as against Local

339 and its affiliates pending the hearing of Local 339's motion for a preliminary injunction, and

the Court so-ordered the parties' stipulation. *See* Docket Entry 5.  The Court should extend the

stay until it decides this motion and preliminarily enjoin the Ordinance and its implementation.

## LEGAL STANDARD

Courts apply the following familiar four-factor test when deciding whether to grant a

temporary restraining order: (1) the likelihood of the movant's success on the merits; (2) the risk

of irreparable harm absent equitable relief; (3) the balance of the equities; and (4) the public

interest.  *See Winter* v. *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Am. Freedom Def.*

*Initiative v. Metro. Transp. Auth.*, 880 F. Supp. 2d 456, 465 (S.D.N.Y. 2012) (granting

preliminary injunction against MTA). Additionally, as an alternative to the factor relating to

likelihood of success, courts can substitute the factor of the existence of "sufficiently serious

questions going to the merits to make them a fair ground for litigation and a balance of hardships

tipping decidedly toward the party requesting the preliminary relief." *Citigroup Global Mkts.,*

*Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35, 37-38 (2d Cir. 2010)

(quotation marks omitted).

## ARGUMENT

## I.  PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

### A.  The Ordinance, the Implementing Rules, and BIC's Registration Forms are Preempted by Federal Labor Law

"Under the Supremacy Clause of the Constitution, state and local laws that conflict with

federal law are without effect." *Figueroa v. Foster*, 864 F.3d 222, 227 (2d Cir. 2017). The

Ordinance conflicts with the NLRA, which comprehensively regulates labor relations and

guarantees workers the right to "form, join, or assist labor organizations" and to "bargain

collectively through representatives of their own choosing." 29 U.S.C. § 157. The Ordinance

also encroaches on the field of officer qualifications governed by the LMRDA. 29 U.S.C. § 504.

The Ordinance, therefore, is invalid under the preemption principles of federal labor law.

The Supreme Court long has recognized that "[t]he comprehensive amalgam of

substantive law and regulatory arrangements that Congress set up in the NLRA," *Local 926, Int'l*

*Union of Operating Eng'rs v. Jones*, 460 U.S. 669, 675-76 (1983), has "occupied the field" of

labor relations "creat[ing] rights in labor and management both against one another and against

the State," *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 109 (1989); *see also Wis.*

*Dep't of Indus., Labor & Human Relations v. Gould, Inc*., 475 U.S. 282, 286 (1986) ("It is by

now a commonplace that in passing the NLRA Congress largely displaced state regulation of

industrial relations."); Cynthia L. Estlund, The *Ossification of American Labor Law*, 102 Colum. L. Rev. 1527, 1572-74 (2002) ("[L]abor law preemption is exceptionally broad" and "virtually banish[es] states and localities from the field of labor relations.").

By Congressional design, the purpose of the NLRA was to obtain "'uniform application' of its substantive rules and to avoid the 'diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies.'" *NLRB v. Nash-Finch Co.*, 404 U.S. 138, 144 (1971) (quoting *Garner v. Teamsters Local Union No. 776*, 346 U.S. 485, 490 (1953)). Indeed, the Supreme Court has cautioned that "nothing could serve more fully to defeat the congressional goals underlying the [NLRA] than to subject, without limitation, the relationships it seeks to create to the concurrent jurisdiction of state and federal courts free to apply the general local law." *Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 286 (1971). State legislation regulating labor relations will be preempted even if the state law was intended to achieve the same goals as federal law. States are prevented not only "from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act." *Gould*, 475 U.S. at 286.

Accordingly, the NLRA has a sweeping preemptive scope. Under *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959), "States may not regulate activity that the NLRA protects, prohibits, or *arguably protects* or prohibits." *Healthcare Ass'n of New York State, Inc. v. Pataki*, 471 F.3d 87, 95 (2d Cir. 2006) (emphasis added). NLRA preemption applies to state regulation that "deters" or "burdens" conduct protected by the NLRA, *id.* at 105, 106—*i.e.*, when there is "a real danger that state rules will conflict with federal ones." *Id.* at 96.

In addition to *Garmon* preemption, NLRA preemption encompasses general federal

preemption principles. Under "impossibility" preemption, federal law preempts state law "when state law penalizes what federal law requires, or when state law claims directly conflict with federal law." *Figueroa,* 864 F.3d at 234 (analyzing NLRA preemption). "Obstacle" preemption "precludes state law that poses an actual conflict with the overriding federal purpose and objective," such that the laws "cannot be reconciled or consistently stand together." *Id.* at 234-35. "What constitutes a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.*

The central focus of the NLRA is to "protect[] the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purposes of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C. § 151. To that end, Section 7 of the NLRA guarantees employees the right "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. . . ." 29 U.S.C. § 157. Construing these sections together, the Supreme Court held that Section 7 precludes state efforts to impose qualifications or licensing regimes on union officials: "Congress attached no conditions whatsoever to [workers'] freedom of choice in [selecting their representatives.] Their own best judgment, not that of someone else, was to be their guide. 'Full freedom' to choose an agent means freedom to pass upon that agent's qualifications." *Hill v. Florida*, 325 U.S. 538, 541 (1945).

In subsequent legislation, Congress adopted two narrow carve-outs from the preemptive scope of *Hill*'s "freedom of choice" principle, which "preserve *some* room for state action concerning the responsibilities and qualifications of union officials." *Brown v. Hotel & Rest.*

*Emps. & Bartenders Int'l Union Loc. 54*, 468 U.S. 491, 506 (1984) (emphasis added).

Notwithstanding these preemption carve-outs, the Ordinance and its implementation interferes

with the exercise of rights protected by Section 7 and the LMRDA's regulation of union officer

qualifications.  It is therefore invalid under *Garmon* preemption principles, and conflict and field

preemption principles, for two reasons.

First, the preemption carve-outs apply only to *state* law—not municipal ordinances.

Second, although "the right of employees to select the officers of their bargaining representatives

is not absolute," *Brown*, 468 U.S. at 505, workers' conduct does not need to be "absolutely

immunized from all legal effect in order to be 'protected' under the NLRA." *Healthcare Ass'n*

*of New York State, Inc.*, 471 F.3d at 100.  State qualification requirements for union officials

remain preempted where, as here, the state regulations "place an unreasonable burden on

collective bargaining representatives, or one that is unrelated to the basic objective of eliminating

racketeering." *Hotel Emps. & Rest. Emps. Int'l Union v. Nevada Gaming Comm'n*, 984 F.2d

1507, 1517 (9th Cir. 1993).

1. **Limited Congressional Carve-Outs To Preemption Do Not Apply Because the Ordinance Is Not a "State" Law within the Meaning of the LMRDA**

   i. **The Terms of the LMRDA Reflect Congress's Intent to Restrict Union Officer Regulation to the Federal and State Governments**

In the LMRDA, enacted in 1959, Congress imposed federal qualification requirements

for union officials. 29 U.S.C. § 504(a).  The LMRDA provides two limited carve-outs to Section

7's preemption of union officer regulations.  First, the LMRDA states that its federal officer

requirements did not "reduce or limit the responsibilities of any labor organization or any officer

. . . under the laws of any State." *Id.* § 523(a).  Second, in 1984 Congress authorized "each

State," as part of a "comprehensive statutory system to eliminate the threat of pervasive racketeering activity," to enact regulations "govern[ing] service in any position in a local labor organization." 29 U.S.C. § 524a. These Congressional carve-outs to preemption, however, apply only to *state* law. Section 7 rights cannot be regulated by a *city* law like the Ordinance.

The plain and unequivocal language of both carve-outs exempt from preemption certain regulation by *states*, but not regulation by cities and other political subdivisions. The LMRDA expressly defines "State" as including "any State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, Wake Island, the Canal Zone, and Outer Continental Shelf lands defined in the Outer Continental Shelf Lands Act." 29 U.S.C. § 402(b) (emphasis added). Likewise, 29 U.S.C. § 524a authorizes "each *State*," as part of a state's "comprehensive statutory system to eliminate the threat of pervasive racketeering activity," to enact regulations "govern[ing] service in any position in a local labor organization." (emphasis added). Neither the statutory preemption carve-outs, nor the statutory definition of the term "State," make any reference to cities or other political subdivisions. That this was intentional and that Congress did not mean for the term "State" to include political subdivisions is evident from the language and design of the statute as a whole. When Congress intended for portions of the LMRDA to cover "State[s] and political subdivisions thereof," it said so directly and explicitly.[12]

---

[12] For example, in defining "employer," the LMRDA states that the term "does not include the United States or any corporation wholly owned by the Government of the United States or any State *or political subdivision thereof*." 29 U.S.C. § 402(e) (emphasis added). In defining "labor organization" the LMRDA states that it includes organizations that are "subordinate to a national or international labor organization, other than a State *or local* central body." *Id.* § 402(i) (emphasis added). When describing the role of government agencies, the law states, "The Secretary [of Labor] may utilize the facilities or services of any department, agency, or establishment of the United States or of any State *or political subdivision of a State*, including

Moreover, reading "State" to mean "State *or local*" renders each reference in the LMRDA to political subdivisions redundant, violating the "cardinal principle of statutory construction," *Williams v. Taylor*, 529 U.S. 362, 404 (2000), that courts should not "adopt a construction making another statutory provision superfluous." *Hohn v. United States*, 524 U.S. 236, 249 (1998). For this reason, the Ordinance is preempted by the NLRA and LMRDA and finds no respite in their specific exemptions.

### ii. Applying the LMRDA's Preemption Carve-Outs to Local Governments Would Impede Federal Labor Law Policy

Allowing all political subdivisions of every state to institute their own requirements for union officer qualifications would create an unworkable system contrary to the uniformity that federal labor law was created to maintain. In an analogous context, the Seventh Circuit recently held that federal labor law carve-outs to preemption for "State" regulations do not apply to local legislation by cities or municipalities. *Int'l Union of Operating Eng'rs Local 399 v. Vill. of Lincolnshire*, 905 F.3d 995 (7th Cir. 2018).[13] In *Lincolnshire*, a village enacted a right-to-work law, *i.e.*, a law forbidding mandatory union membership or payment of agency fees as a condition of employment, based on an NLRA carve-out for "State or Territorial" law. 29 U.S.C. § 164(b) (NLRB § 14(b)). The Seventh Circuit concluded that irrespective of whether the state purported to delegate such authority to its political subdivisions, in the context of Federal labor law where Congress has "preempted the field . . . [and] cede[d] some power back to the states, []

---

the services of any of its employees, with the lawful consent of such department, agency, or establishment." *Id.* § 527 (emphasis added).

[13] The Supreme Court granted certiorari in *Village of Lincolnshire*, but subsequently vacated the Seventh Circuit's decision as moot as a result of intervening legislation by the State of Illinois that expressly precluded political subdivisions of the state from enacting labor regulations on the subject at issue. 139 S. Ct. 2692 (2019).

it makes no sense to say that states can re-delegate that power." *Id.* at 1004 (disagreeing with *United Automobile Workers v. Hardin County*, 842 F.3d 407 (6th Cir. 2016)).

The court in *Village of Lincolnshire* reached this conclusion for three reasons. First, the preemption carve-out at issue—like 29 U.S.C. §§ 523(a) & 524a—only referred to "State and Territorial law" as exempted from federal preemption and did not mention municipalities or political subdivisions. *Id.* at 1003 (construing NLRA Section 14(b), 29 U.S.C. 164(b)). Second, beyond this strictly textualist reasoning, the court emphasized the dire practical implications of allowing innumerable political subdivisions to create their own union regulations, which "would create [] administrative nightmares" and "do violence to the broad structure of labor law—a law that places great weight on uniformity." *Id.* at 1004, 1005. As compared to just 50 state governments, over 90,000 general and special-purpose governments exist within the states. *Id.* As a result, "[t]he consequences for the uniformity of national labor law would be catastrophic . . . [and] Congress enacted the NLRA to *create* national uniformity in labor law." *Id.* at 1005-06 (citing *NLRB v. Nash–Finch Co.*, 404 U.S. 138, 144 (1971)) (emphasis added). Each of these arguments was echoed in an amicus brief submitted by the National Labor Relations Board ("NLRB") in *Lincolnshire*, expressing deep concern that allowing cities or counties to enact their own laws on matters of labor relations "poses an obstacle to industrial peace by destabilizing long standing expectations, by unduly complicating the collective bargaining process, and by creating a wholly unworkable regulatory patchwork on a scope substantially more complex than anything Congress envisioned or intended." *See* Brief of NLRB as *Amicus Curiae*, 2017 WL 2930629 (July 5, 2017).

Third, the Seventh Circuit explained that Section 14(b) is "an exception to the general preemption established in the Act for the field of labor relations," and thus the "question is only

how much subnational authority does section 14(b) *restore*." *Vill. of Lincolnshire*, 905 F.3d at 1008 (emphasis added). Thus, the exception must be read with "an eye both to the scope of the exception and to its effect on the remainder of the law," *id.* at 1007, including the disruption of the national uniformity of labor law.

Other courts evaluating preemption under provisions of the NLRA reached similar conclusions, reasoning that "[a] myriad of local regulations would create obstacles to Congress' objectives under the NLRA . . . [and] [t]he result would be a crazy-quilt of regulations within the various states." *New Mexico Fed'n of Labor v. City of Clovis*, 735 F. Supp. 999, 1002 (D.N.M. 1990). In response to the argument that Congress intended to create this "crazy-quilt" by delegating regulatory authority to the states, the court in *City of Clovis* noted that "the diversity that would arise if cities, counties, and other local governmental entities were free to enact their own regulations" is "qualitatively different" from "the diversity that arises from different regulations among various of the 50 states." *Id.* at 1002-03. Similarly, the highest court in Kentucky rejected a city's effort to avoid preemption based upon an NLRA provision authorizing legislation by a "state," concluding, "Congress was willing to permit varying polices at the state level," but it clearly did "not . . . intend[] to allow as many local policies as there are local political subdivisions in the nation." *Kentucky State AFL-CIO v. Puckett*, 391 S.W.2d 360, 362 (Ky. 1965).

Like NLRA § 14(b), the preemption carve-outs at issue here only create federal preemption exemptions for "the laws of any State," 29 U.S.C. § 523(a), and for "State . . . comprehensive statutory system[s]," 29 U.S.C. § 524a, without referencing political subdivisions. In both the NLRA and LMRDA, when Congress did want to refer to local law, it did so explicitly. The reasoning applied in *Village of Lincolnshire*, that allowing political

subdivisions to further regulate these federally-regulated areas would be "catastrophic" for uniformity, is even more acute in this case. *See Vill. of Lincolnshire*, 905 F.3d at 1005-06. New York State has over 3,400 local governments and numerous unions and union locals operate across these municipalities. *See* Stephen D. Owens, *2012 Census of Governments, Individual State Descriptions*, U.S. Census Bureau, 203 (2013). If even a handful of these political subdivisions enacted varying qualifications for union officers, the result would be a "crazy-quilt" of overlapping and unworkable regulations. *City of Clovis*, 735 F. Supp. at 1002. Because municipalities only are authorized to regulate within their own jurisdictions, such a system inevitably would lead to inconsistent and legally-ambiguous scenarios where one municipality disqualifies a union officer, but other municipalities where the same union operates do not.[14]

The "crazy-quilt" would be still more confusing because a municipal agency's regulation of officer qualifications will inevitably impact workers *outside* of its legal and geographic jurisdiction. For example, the Ordinance regulates the union representatives of Local 339 employees who work outside the trade waste industry and outside of the City. Were other municipalities to follow suit, the overlap and conflict among municipal requirements would become even more unworkable. Thus, although 29 U.S.C. §§ 523(a) and 524a allow some room for *state* legislation on labor matters, they "could not have intended to allow as many local policies as there are local political subdivisions in the nation." *Puckett*, 391 S.W.2d at 362. Finally, like the Section 14(b) carve-out in *Village of Lincolnshire*, the LMRDA carve-outs are

---

[14] Local politics will inevitably exacerbate the "crazy quilt" of qualifications and other requirements imposed by municipalities. The result will be a patchwork of politically gerrymandered regulations, where municipalities are free to favor politically connected unions at the expense of their competitors. Local Law 55 is a case in point. On June 17, 2021, the City Council passed an amendment to Local Law 55 that will exempt the trade waste workers of Teamsters Local 282, which, unlike Local 339, historically had connections to organized crime. Barry Decl. (¶¶ 18-20).

exceptions to the broad preemption of the NLRA, and therefore should not be read to disrupt the uniformity of federal labor law.

Congressional carve-outs to federal labor law preemption mean what they say. The provisions create a limited exception to federal preemption for "the laws of any *State*." 29 U.S.C. § 523(a) (emphasis added); *accord* 29 U.S.C. 524a. The Ordinance is not a "law[] of any State" and is thus not saved from preemption by these carve-outs.

### 2. The Ordinance and BIC's Implementation Infringes upon Section 7 Rights and Impairs the Effectiveness of Unions as Collective Bargaining Agents

The regulatory scheme challenged here is unlike any non-federal regulation previously upheld against preemption. Even if the Ordinance had been enacted by a state (rather than as it was by a city), the Ordinance and its implementation would be preempted because it deeply interferes with Section 7 rights by imposing conditions so burdensome as to threaten the willingness of any union officer to hold that position, and restricts union officials' ability to associate with members of their own union. No prior case has considered, much less upheld, a regulation precluding any person from serving as an officer of a union absent a wholesale and unlimited waiver of his or her constitutional privacy rights. That alone creates a disincentive to serving as a union officer, and an impediment to workers' freedom of choice in union leadership, so powerful as to bring the Ordinance in direct conflict with the delicate balance between the rights of private employers, employees, and unions that Congress struck in the NLRA and LMRDA.

The threat of draconian penalties and the ill-defined circumstances in which those penalties will be incurred also impairs federal labor policy. By threatening permanent disqualification for union officers who "associate" with people whom the union officer "should have known" were associated with an organized crime group or had prior convictions for certain

offenses, the Ordinance seriously undermines free discussion and association between union leaders and the membership of the union. The trade waste industry has a disproportionate number of workers with criminal convictions, and thus compliance with the ban on association will inhibit union officials from associating with the workers they represent, and require Local 339 to mandate extensive disclosure requirements from its own members. (Barry Decl. ¶ 28). Even where a union officer believes in good faith that a union member has no disqualifying convictions or associations, the possible penalty for having been mistaken produces a chilling effect. A more inhibiting influence on organizational activity or debate than requiring a union officer to act at his or her peril when communicating with its own members, with the possibility of draconian penalties because a member—unbeknownst to the officer—had a disqualifying history, is difficult to imagine.

This burden on Section 7 rights is exacerbated because it treads on the First Amendment "freedom of association," which "encompasses the right of union members to select their representatives." *Local 186, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Brock*, 812 F.2d 1235, 1237 (9th Cir. 1987); *Bhd. of R. R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1, 6 (1964) (recognizing that "the right of members to consult with each other in a fraternal organization necessarily includes the right to select a spokesman from their number who could be expected to give the wisest counsel."). BIC's ban on association also directly conflicts with the union's ability to comply with its obligation under federal law to fairly represent its members. *See Int'l Bhd. Of Elec. Workers v. Foust*, 442 U.S. 42, 47 (1979) (recognizing duty of fair representation), as well as the right of association protected expressly by federal labor law. 29 U.S.C. § 411(a)(2).

Moreover, BIC's purported justification for imposing these "unreasonable burden[s] on

collective bargaining representatives," *Nevada Gaming Comm'n*, 984 F.2d at 1517, is in

irreconcilable tension with the NLRA.  BIC seeks to regulate which unions are "actually going to

be good for the company and good for the workers," and which unions are in its opinion

"company-controlled" unions and which it believes are not.[15]  Fatal to the efforts of the City to

decide what types of unions to allow, however, is the fact that the NLRA's preemptive effect

protects the right of workers to select a labor union of *their own* choosing. 29 U.S.C. § 157

(workers have the right to "bargain collectively through representatives of their own choosing");

*Brown*, 468 U.S. at 509-10; *see also Metro. Milwaukee Ass'n of Com. v. Milwaukee Cnty.*, 431

F.3d 277, 281 (7th Cir. 2005) (Posner, J.) (a county may not "substitute its own labor-

management philosophy for that of the" NLRA).

In sum, BIC's restrictions on union officials penalize and deter conduct protected by

Section 7— workers' selection of union representatives of their choosing and those

representatives' ability to communicate and associate with union membership.  No question

exists that these restrictions apply to conduct that Section 7 at least "*arguably* protects."

*Healthcare Ass'n of New York State, Inc.*, 471 F.3d at 95 (emphasis added).  Although the city

may have a local interest in regulating the qualifications of union officials to root out crime,

BIC's demand for a complete waiver of all privacy rights is far too overbroad to avoid *Garmon*

preemption. *See Healthcare Ass'n of New York State*, 471 F.3d at 106.  Moreover, BIC's

authority granted by the Ordinance to disqualify union officers from their positions extends to

officers representing union members well beyond BIC's jurisdiction—*i.e.*, Local 339 members

---

[15] *See supra* at 4-5 & 4-5 nn. 7-8.

working outside the City or in occupations outside of BIC's jurisdiction.[16]  Thus, the Ordinance

and BIC's implementation thereof are preempted based on *Garmon* preemption, as well as the

impossibility and obstacle branches of conflict preemption.

**B.     The Ordinance Violates the New York State Constitution By Infringing on Employees' Right to Bargain Through Representatives of Their Own Choosing**

The Ordinance and its implementation violate Article I, Section 17 of the New York

Constitution by infringing on the union members' right to choose their union representatives.

Under Section 17, "Employees shall have the right to organize and to bargain collectively

through representatives of their own choosing."  N.Y. Const. Art. I, § 17.  This Section was

passed "to protect employees against legislation or acts which would prevent or interfere with

their organization and choice of representatives for the purpose of bargaining collectively."

*Quill v. Eisenhower*, 113 N.Y.S.2d 887, 889 (Sup. Ct. N.Y. Cnty. 1952).[17]  Article I, Section 17,

which was ratified in 1939, uses the same unequivocal language as Section 7 of the NLRA,

which was enacted in 1935.  Thus, it should be read broadly to prohibit state legislative action

that places qualifications or burdens on union representatives.  *Accord Hill*, 325 U.S. at 541

(interpreting identical language in the NLRA as providing absolute protection for employees'

choice of bargaining representatives);[18] *Hernandez v. New York*, 173 A.D.3d 105, 112 (N.Y.

---

[16] Section 16-509(g) of the Ordinance is also overbroad in that it permits BIC to "disqualify an officer of a labor union or labor organization from holding office" *without limitation*—including an officer serving workers' outside of the City and outside of the trade waste industry.

[17] The right of employees to collective bargaining by representatives of their own choosing is a "right of property," which may be protected by injunction.  *Domanick v. Triboro Coach Corp.*, 18 N.Y.S.2d 960 (Sup. Ct. N.Y. Cnty., *rev'd on other grounds*, 259 A.D. 657  (N.Y. 1940)).

[18] The Supreme Court subsequently held that when Congress passed the LMRDA—specifically, § 504(a) of that Act, which sets forth certain officer qualifications—it opened the door to some

App. Div. 3d Dep't 2019) (holding that "the choice to use the broad and expansive word 'employees' in N.Y. Constitution, article I, § 17, without qualification or restriction, was a deliberate one that was meant to afford the constitutional right to organize and collectively bargain to any person who fits within the plain and ordinary meaning of that word").

The Ordinance, and BIC's implementation of it, place an onerous burden on union representation. Current union representatives understandably will resign rather than sign BIC's gaping privacy waiver, and prospective union representatives will not be likely to rush to fill those positions. (Barry Decl., ¶¶ 25-26). The Ordinance and BIC's implementation have created an impediment to free selection of union representation in violation of the New York Constitution.

Moreover, New York courts have held that the right to choose union representatives "is a fundamental right, and that any statute impairing this right must withstand strict scrutiny." *Hernandez*, 173 A.D.3d at 114. Under strict scrutiny review, a statute that infringes upon a fundamental right is "void unless necessary to promote a compelling [s]tate interest and narrowly tailored to achieve that purpose." *Id.* at 114-15. Here, the authorization release forms promulgated by BIC will require Local 339 and its representatives to waive their privacy rights to "any and all information" that BIC requests. BIC cannot sincerely argue that such a broad privacy waiver is narrowly tailored to New York's interest in regulating unions.

The Ordinance and BIC's implementation of the Ordinance therefore violate Article I, Section 17 of the New York Constitution.

---

state regulation of union officer qualifications. *Brown*, 468 U.S. at 505. No similar amendment has been made to the New York State Constitution.

### C. The Application Forms Violate the United States and New York State Constitutions

#### 1. The Release Authorization Forms Violate Local 339's and Its Officers' Privacy Rights

The "release authorization" form promulgated by BIC is unconstitutional on its face under the Fourth Amendment to the United States Constitution and Article I, Section 12 of the New York State Constitution. First, it operates as a general warrant by giving the City unfettered access to every communication, document and piece of data of unions and union officers without any discernable limits. Second, it fails to provide any mechanism for unions and union officers to object and obtain a pre-compliance review or hearing by a neutral decisionmaker prior to the administrative search.

The Fourth Amendment covers all information that a person or entity "seeks to preserve . . . as private," so long as their expectation of privacy is "reasonable." *Katz v. United States*, 389 U.S. 347, 351 (1967); *accord Soldal* v. *Cook County*, 506 U.S. 56, 64 (1992). Where the Fourth Amendment applies, government officials may not demand access to information unless they follow certain procedures. Most of the time, they must obtain a warrant. *See Arizona v. Gant*, 556 U.S. 332, 338 (2009). That is true for information taken from "commercial premises as well as homes." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978). An exception to the warrant requirement applies where the government is conducting an "administrative search." *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2452 (2015). An administrative search is generally an inspection or search carried out under a regulatory or statutory scheme to enforce compliance with regulations or laws pertaining to health, safety, or security. *See id.*; *Camara v. Mun. Court of City of San Francisco*, 387 U.S. 523, 534 (1967). In conducting "administrative searches," the government need not obtain a warrant, but absent exigent circumstances, it must provide "the subject of [its] search" with "an opportunity to obtain precompliance review before a neutral

decisionmaker." *Patel*, 135 S. Ct. at 2452 (citations omitted). Thus, when an administrative agency—such as BIC—seeks to review a union's or union representative's records, it must do so pursuant to a scheme that allows the parties to seek precompliance review. This requirement minimizes the risk that searches "will exceed statutory limits, or be used as a pretext to harass." *Id.* at 2453. Moreover, whether the government proceeds by administrative subpoena or search warrant, the Fourth Amendment requires that the scope of the records sought must be reasonably tailored to request only relevant documents. *In re Grand Jury Subpoena, JK-15-029*, 828 F.3d 1083, 1088 (9th Cir. 2016).

The Supreme Court's 2015 decision in *Patel* demonstrates how the Fourth Amendment applies to governmental searches in the context of this case. There, the Supreme Court assessed a Los Angeles ordinance that "require[d] hotel operators to record information about their guests," including "the guest's name and address; the number of people in each guest's party; . . . the guest's date and time of arrival and scheduled departure date; . . . [and] the rate charged." *Id.* at 2447-48. The Los Angeles ordinance also required hotels "to make their registries available to the police on demand." *Id.* In response to the hotel industry's challenge to that ordinance, the Supreme Court first concluded that the Fourth Amendment protected the hotels' right to privacy in such information. *See id.* at 2451-52. Then, construing the contemplated inspections as administrative searches, the Court held that the ordinance was "facially unconstitutional because it [would] penalize[] [hotel operators] for declining to turn over their records without affording them any opportunity for precompliance review." *Id.* at 2447; *see also id.* at 2451-54. The Court noted that it had "never attempted to prescribe the exact form an opportunity for precompliance review must take," but noted that "the City does not even attempt to argue that [the ordinance] affords hotel operators any opportunity whatsoever." *Id.* at 2452. For this

reason, the ordinance was "facially invalid."  *Id.*

Similarly, in *Airbnb, Inc. v. City of New York*, companies operating online marketplaces for short- and long-term home sharing brought suit against New York City, seeking to enjoin enforcement of a City ordinance that would require monthly disclosure of the companies' user data.  373 F. Supp. 3d 467 (S.D.N.Y. 2019).  The City ordinance would have required the companies to turn over "voluminous data regarding customers who use their platforms to advertise short-term rentals" each month.  *Id.* at 472.  The plaintiffs—relying on *Patel*—argued "that the Ordinance unconstitutionally compel[led] [the companies] to turn over information in which they ha[d] a protected Fourth Amendment interest without any opportunity for pre-compliance review before a neutral decision-maker."  *Id.* at 476-77.  The court agreed and preliminarily enjoined the ordinance from taking effect.

In this case, the privacy interests at stake are more significant than those underlying the decisions in *Patel* and *AirBnB*.  The "release authorization form" demands a blanket waiver that would allow BIC to obtain "any and all information" from the union and union representatives. This language is not limited by subject matter:  if signed, the union and its representatives will grant BIC access to "any and all information" they possess.  Moreover, signatories to BIC's form are required to authorize the release of "any and all information" from third parties.  (Barry Decl., Ex. B at 12 & Ex. C at 6.)  At bottom, the release form will require Local 339 and its representatives to waive the entirety of their privacy rights in any information they hold.  Such an unconstrained privacy intrusion, if ever it could be justified, cannot be allowed without precompliance oversight by a neutral decision-maker.  *Patel*, 135 S. Ct. at 2452; *Airbnb*, 373 F. Supp. 3d at 501.  Therefore, as in *Patel* and *AirBnB*, the release authorization forms in this case are facially invalid under the Fourth Amendment.  *See Liberty Coins, LLC v. Goodman*, 880 F.3d

274 (6th Cir. 2018) (holding a state law provision and implementing regulation giving state inspectors access to all of a precious metal dealer's records at all times without an opportunity for precompliance review was facially unconstitutional).

For similar reasons, the release authorization violates Article I, Section 12 of the New York Constitution, which confers even broader privacy protections than the Fourth Amendment and is less tolerant of searches conducted without legal process. *People v. Scott*, 79 N.Y.2d 474, 498 (1992). Like the Fourth Amendment to the U.S. Constitution, Article I, Section 12 of the New York Constitution protects "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." N.Y. Const. Art. I, § 12. At a minimum, the release authorization forms violate Section 12 for the same reasons stated above with respect to the Fourth Amendment.

Moreover, as this Court has recognized, "New York's State Constitution, [A]rticle I, § 12, affords greater protection against warrantless searches than the U.S. Constitution." *5 Borough Pawn, LLC* v. *City of New York*, 640 F. Supp. 2d 268, 278 (S.D.N.Y. 2009); *People v. Scott*, 79 N.Y.2d 474, 496-97 (1992) ("[W]e have not hesitated in the past to interpret [A]rticle I, § 12 of the State Constitution independently of its Federal counterpart when necessary to assure that our State's citizens are adequately protected from unreasonable governmental intrusions."). As the Court of Appeals has explained, "statutorily authorized administrative searches . . . must be *narrowly and precisely* tailored to prevent the subversion of the basic privacy values embodied in our Constitution," and even then, such searches only can "pass constitutional muster" where the relevant industry has the aspect of "pervasive governmental supervision." *Scott*, 79 N.Y.2d at 498-99 (emphasis added). For purposes of Section 12, a pervasively regulated industry is one subject to a regulatory scheme that "include[s] detailed standards in

such matters as, for example, the operation of the business and the condition of the premises."
*Id.* at 499. This "narrow[] and precise[]" standard is even stricter than the standard under the
Fourth Amendment. *See, e.g.*, *id.* at 499-500 (holding that junkyards are not pervasively
regulated under New York law, even though the U.S. Supreme Court had held that they were
closely-regulated under the Fourth Amendment). Thus, even if the release authorization could
pass muster under the Fourth Amendment, it would still violate Article I, Section 12 of the New
York Constitution.

> **2.     The Release Authorization Forms Impose an Unconstitutional
> Condition Because BIC Places a Condition on Receipt of a Benefit
> that Violates the Recipients' Constitutional Rights**

The release authorization also creates an unconstitutional condition whereby Local 339
and its officers are forced to waive federal rights as a condition of registering with BIC.
"Pursuant to th[e] 'unconstitutional conditions' doctrine, . . . the government may not place a
condition on the receipt of a benefit or subsidy that infringes upon the recipient's constitutionally
protected rights, even if the government has no obligation to offer the benefit in the first
instance." *Alliance for Open Society Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 231
(2d Cir. 2011) (citation omitted); *see also Perry v. Sindermann*, 408 U.S. 593 (1972). Put
differently, the unconstitutional conditions doctrine "vindicates the Constitution's enumerated
rights by preventing the government from coercing people into giving them up." *Koontz v. St.
Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013); *Speiser v. Randall*, 357 U.S. 513, 526
(1958) (holding that the government may not use an unconstitutional condition to "produce a
result which the State could not command directly"). A plaintiff need not forfeit a right in order
to sue to protect it, because it is the choice itself that offends the Constitution. *Koontz*, 570 U.S.
at 606. In other words, the constitutional violation occurs when the government commands a

person to choose between surrendering a right or paying a penalty, not when the person actually surrenders that right. *Id.* ("[W]e have recognized that regardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them.")

Here, BIC seeks to "produce a result which [it] could not command directly," *Speiser*, 357 U.S. at 526—*i.e.*, conditioning participation in Local 339 leadership (the benefit) on a wholesale waiver of union officers' constitutional rights to privacy and association (the deprivation). BIC could not demand full access to the private information of Local 339's leadership, and it may not threaten rights guaranteed by federal statute and the New York Constitution (to choose and serve as a union official) to accomplish that result. Because BIC seeks to push unions and their representatives to choose between disqualification and monetary sanctions, or waiver of their state and federal constitutional rights, the Court should find that the release authorization forms impose an unconstitutional condition.

### 3. The Onerous Application Forms Violate the New York City Administrative Procedure Act

The improperly intrusive application forms are invalid because they violate the rulemaking requirements of the New York City Administrative Procedures Act ("CAPA"). CAPA imposes requirements on New York City agencies, like BIC, related to their promulgation of rules. NY City Charter § 1043; *Council of City of New York v. Dep't of Homeless Servs. of City of New York*, 22 N.Y.3d 150, 153 (2013). These regulations include giving the public 30-days' notice of a new rule's adoption and holding a public hearing prior to implementation. *Id*. "The fundamental purpose of CAPA is 'to inform and gather input from the public on the development and promulgation of the myriad of City agency rules that affect New Yorkers: to

provide accountability and openness.'" *Ordonez v. City of New York*, 110 N.Y.S.3d 222 (N.Y. Sup. Ct. 2018). If an agency does not "follow the public vetting process required by CAPA for adopting a new rule," the rule "is a nullity." *Lynch v. New York City Civilian Complaint Rev. Bd.*, 183 A.D.3d 512, 518 (1st Dep't 2020); *Entergy Nuclear Indian Point 2, LLC v. New York State Dep't of State*, 130 A.D.3d 1190, 1195 (3d Dep't 2015) (When an agency acts in a way that "amounts to formal rulemaking but does not comply with the procedural requirements" the action "must be annulled." ).

CAPA defines "Rule" as "any statement . . . that [] implements or applies law or policy." NY City Charter § 1041(5). Courts consider an agency action a "Rule" when it establishes "a fixed, general principle to be applied by an administrative agency without regard to other facts and circumstances relevant to the regulatory scheme of the statute it administers." *Dep't of Homeless Servs.*, 22 N.Y.3d at 154.

In an analogous case, the New York City Department of Homeless Services (DHS) adopted a new "eligibility procedure" without following the formal rulemaking process. *Dep't of Homeless Servs.*, 22 N.Y.3d at 153. This procedure required applicants to produce documentation pertaining to prior housing and financial resources and failure to do so could result in denial of benefits. *Id.* at 155. DHS argued that the procedure was not a "Rule" because DHS workers would exercise discretion in whether to grant benefits. *Id.* at 155. DHS also argued that the procedure fell within a CAPA exemption for "any 'form, instruction, or statement or communication of general policy, which in itself has no legal effect but is merely explanatory'." *Id.* at 156 (quoting NY City Charter § 1041(5)(b)(ii)). The court rejected these arguments, holding that the procedure amounted to a "Rule" under CAPA, because the procedure was mandatory and "[m]andatory procedures and uniform standards of this type have generally

been determined to be rules under our precedent." *Id.* at 154. The procedure was broad, pertaining to everyone seeking benefits, and "require[d] the application of standards that [were] dispositive of the outcome." *Id.* at 154; *see also Schwartfigure v. Hartnett*, 83 N.Y.2d 296, 301-02 (1994) (invalidating agency action because action was "invariably applied across-the-board to all claimants without regard to individualized circumstances or mitigating factors, and as such falls plainly within the definition of a 'rule.'")

In this case, the application forms—requiring broad disclosure and waiver of numerous rights—are mandatory and were not subject to the formal rulemaking process. Failure to submit the application forms will result in fines and disqualification of Local 339 officers. These mandatory authorizations, with severe consequences for noncompliance, are precisely the sort of rules for which CAPA's procedures were designed. *See Dep't of Homeless Servs.*, 22 N.Y.3d at 155. The application forms, therefore, amount to a "Rule" within the meaning of CAPA and are invalid because of the City's failure to follow the rulemaking procedures. *See Entergy*, 130 A.D.3d at 1194–95.

## II. LOCAL 339, ITS OFFICERS, AND ITS MEMBERS WILL BE IRREPARABLY HARMED ABSENT A PRELIMINARY INJUNCTION

Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). A plaintiff need show only "a *threat* of irreparable harm, not that irreparable harm already [has] occurred." *Mullins v. City of N.Y.*, 626 F.3d 47, 55 (2d Cir. 2010) (emphasis in original). Here, as described in the Declaration of Kevin Barry, Local 339 and its members and

officers[19] are likely to suffer irreparable harm in multiple ways.

*First*, union representatives who sign the authorization release forms will have waived their right to prevent BIC from demanding "any and all information" from them (Barry Decl. ¶¶ 21-23, Ex. B at 12 & Ex. C at 6). Disclosure of highly personal and confidential information "is the quintessential type of irreparable harm that cannot be compensated or undone by money damages." *Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000).

*Second*, the Ordinance and its implementation will violate Local 339 members' rights under the federal and New York State constitutions. The law necessarily will cause Local 339 irreparable harm in the absence of a preliminary injunction because "an alleged deprivation of a constitutional right is involved." *See Mitchell* v. *Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984).

*Third*, the Ordinance and its implementation create an unconstitutional condition, which itself is an irreparable harm. Where a government creates an unconstitutional condition, a plaintiff need not forfeit a right in order to sue to protect it. *Koontz*, 570 U.S. at 606 ("[W]e have recognized that regardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them.").

*Fourth*, the Ordinance and its implementation will irreparably damage Local 339's ongoing collective bargaining relationship, delay the process of grievances, and disrupt internal union affairs. The burdensome and redundant layer of regulation (and expense of compliance) imposed by the Ordinance and its implementation, coupled with the requirement that officers

---

[19] Local 339 has associational standing to assert claims on behalf of its officers and members. *Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Serv.*, 604 F. Supp. 2d 665, 676 (S.D.N.Y. 2009).

waive wholesale their privacy rights, will drive reputable unions like Local 339 from the industry and significantly limit the pool of individuals willing to serve as a union officer in the unions that remain. Local 339 and its members will be significantly harmed by reduced competition among unions that remain in the industry, the unwillingness or inability of qualified individuals to serve as union officers in any unions that remain, and the loss of existing officers, who have more than two decades of experience. (Barry Decl. ¶¶ 2, 25-26). Additionally, the Ordinance's threat of disqualification for union officers who "associate" with persons with certain criminal histories or associations impedes Local 339's ability to comply with its federal obligation to fairly represent its members. Local 339 also would be required to mandate extensive disclosures from its own members to ensure that Local 339's officers did not violate Local Law 55 by "associating" with any person (member or non-member) who had certain proscribed criminal convictions or associations. This would cause significant harm to Local 339—including deterring individuals with criminal convictions or associations from joining or remaining members of Local 339, inhibiting union officials' ability to communicate with their members, and damaging Local 339's relationship with its members. (Barry Decl. ¶¶ 28-29).

Therefore, Local 339 and its members and officers stand to suffer irreparable harm absent a preliminary injunction.

## III. THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR A PRELIMINARY INJUNCTION

The balance of the equities and the public interest support the issuance of a preliminary injunction. Whereas Local 339 and its officers risk the loss of their constitutional rights, the City will not be harmed by maintaining the *status quo*. Indeed, by voluntarily holding the implementation of Local Law 55 in abeyance from October 2019 until July 1, 2021, BIC has demonstrated that the implementation of Local Law 55 is anything but urgent. More broadly, the

City's regulatory oversight scheme for the trade waste industry has not applied to unions and union officials since its inception—twenty-five years ago. Thus, a temporary preservation of the *status quo* will not prejudice the City. Further, in investigating potential violations of law, the City can still serve subpoenas and other legal process that are sufficient to meet the City's investigative needs. The City can continue to promote the public interest in regulating unions through other constitutional channels, whereas the public's interest in allowing workers to "bargain collectively through representatives of their own choosing," N.Y. Const. Art. I, § 17, was immediately impacted when the release authorization forms were due on July 1, 2021. Moreover, unions in the trade waste industry (including Local 339) remain heavily regulated at the federal level. (Barry Decl. ¶ 8). Therefore, the balance of the equities and the public interest warrant the issuance of a preliminary injunction.

Finally, having already agreed to stay enforcement of Local Law 55 against Local 339 pending a hearing on this motion, the City will not be harmed by an extension of the stay until the Court makes its decision. Given the threat of irreparable harm to Local 339, its officials, and its members, the Court should maintain the stay until it decides this motion.

## CONCLUSION

Local 339 has shown a likelihood of success on the merits—or has, at least, presented "sufficiently serious questions going to the merits to make them a fair ground for litigation." *VCG Special Opportunities Master Fund Ltd.*, 598 F.3d at 35, 37-38 (quotation marks omitted). The Court should grant the plaintiff's motion for a preliminary injunction, and enjoin BIC from enforcing the Ordinance, its Rules and the disclosure requirements (including the unlimited "Release Authorization" required of union officials) for the duration of this lawsuit (and, at a minimum, pending the adjudication of this motion).

Date:  New York, New York
       July 15, 2021

                         MORVILLO ABRAMOWITZ GRAND
                         IASON & ANELLO P.C

                         By:  _____/s/ Robert J. Anello_____
                              Robert J. Anello
                              Edward M. Spiro
                              Jacob W. Mermelstein
                              Curtis B. Leitner
                         565 Fifth Avenue
                         New York, NY 10017
                         (212) 856-9600

                         *Attorneys for Plaintiff United Service Workers
                         Union Local 339, IUJAT*