UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED SERVICE WORKERS UNION
LOCAL 339, IUJAT,

                    Plaintiff,                          21 Civ. 5469 (KPF)

          - against -

THE CITY OF NEW YORK,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
<u>PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION</u>**

                         Robert J. Anello
                         Edward M. Spiro
                         Curtis B. Leitner
                         Bronwyn C. Roantree

                         MORVILLO ABRAMOWITZ GRAND IASON
                         & ANELLO P.C.
                         565 Fifth Ave.
                         New York, NY 10017
                         (212) 856-9600

                         *Attorneys for Plaintiff United Service Workers
                         Union Local 339*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

I.    The Ordinance Is Preempted By the NLRA ................................................................. 3

A.    The Preemption Carveouts in the LMRDA Do Not Apply To Municipalities .. 3

B.    Neither the *Mortier* Nor *Ours Garage* Decisions Mandate the Conclusion that the Ordinance Falls Within a Preemption Carveout .................................... 5

C.    Section 7 of the NLRA and Section 17 of the New York State Constitution Preempt the Ordinance Even If the LMRDA's Preemption Carveouts Apply To Municipalities ................................................................................................ 7

II.   The Release Violates the United States and New York State Constitutions ............... 9

A.    Local 339 and Its Officers Have a Constitutionally-Protected Privacy Interest in Information Subject To the Release ................................................... 8

B.    The Release Is an Administrative Search ......................................................... 9

C.    The Release Is Unconstitutional Because It Does Not Provide an Opportunity for Pre-Compliance Review ........................................................ 10

D.    The Closely Regulated Industry Exception Does Not Apply, And Even If It Does, the Release Is Unconstitutional Because It Has No Time, Place, or Scope Limitations ............................................................................................ 10

E.    The Release Violates Local 339's First Amendment Freedom of Association ....................................................................................................... 14

III.  The Release Violates the New York City Administrative Procedure Act ................. 14

IV.   Local 339 Has Demonstrated that It Will Suffer Irreparable Harm and the Balance of the Equities and Public Interest Favor a Preliminary Injunction ........................... 15

CONCLUSION ..................................................................................................................... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airbnb, Inc. v. City of N.Y,*
    373 F.Supp.3d 467 (S.D.N.Y. 2019) ................................................................. 10

*Allinder v. State of Ohio,*
    808 F.2d 1180 (6th Cir.) ................................................................................... 13

*Americans for Prosperity Found. v. Bonta,*
    141 S. Ct. 2373 (2021)...................................................................................... 14

*Anobile v. Pelligrino,*
    303 F.3d 107 (2d Cir. 2002) ...................................................................... 9, 10, 13

*Bhd. of R.R. Trainmen v. Virginia ex rel. Va. State Bar,*
    377 U.S. 1 (1964) ............................................................................................. 14

*Brown v. Hotel Emps. v. Nevada Gaming Comm'n,*
    468 U.S. 491 (1984) ....................................................................................... 4, 8

*Chalfy v. Turoff,*
    804 F.2d 20 (2d Cir. 1986) ............................................................................... 10

*City of Los Angeles, Calif. v. Patel,*
    576 U.S. 409 (2015) .............................................................................. 10, 11, 13

*Columbus v. Ours Garage,*
    536 U.S. 424 (2002) ....................................................................................... 5, 6

*Council of City of New York v. Dep't of Homeless Servs.,*
    22 N.Y.3d 150 (N.Y. 2013) ......................................................................... 14, 15

*District of Columbia v. Carter,*
    409 U.S. 418 (1973) ....................................................................................... 5, 6

*EZ Pawn Corp. v. City of New York,*
    390 F. Supp. 3d 403 (E.D.N.Y. 2019) ............................................................... 13

*Gem Financial Svc., Inc v. City of N.Y.,*
    298 F.Supp.3d 464 (E.D.N.Y. 2018) ................................................................. 13

*Healthcare Ass'n of New York State, Inc. v. Pataki,*
    471 F.3d 87 (2d Cir. 2006) ................................................................................. 7

*Hotel Emps. v. Nevada Gaming Comm'n*,
  984 F.2d 1507 (9th Cir. 1993) ........................................................................ 8

*Kissel v. Seagull*,
  2021 WL 3088037 (D. Conn., July 21, 2021) .............................................. 14

*Loc. 399 v. Lincolnshire*,
  905 F.3d 995 (7th Cir. 2018) ...............................................................Passim

*Local 186. v. Brock*,
  812 F.2d 1235 (9th Cir. 1897) ..................................................................... 14

*Longshoremen's Ass'n v. Waterfront Com.*,
  16 Misc. 2d 632 (Sup. Ct. 1958).................................................................... 8

*Marshall v. Barlow's, Inc.*,
  436 U.S. 307 (1978) ............................................................................... 11, 13

*New York v. Burger*,
  482 U.S. 691 (1987) ......................................................................... 11, 12, 13

*NLRB v. Nash-Finch Co.*,
  404 U.S. 138 (1971) .................................................................................. 1, 2, 4

*NLRB v. Virgin Islands Casino Control Commission*,
  2021 WL 4990628 (D.V.I. Oct. 27, 2021) ..................................................... 3

*Palmieri v. Lynch*,
  392 F.3d 73 (2d Cir. 2004) ............................................................................ 9

*People v. Scott*,
  79 N.Y.2d 474 (N.Y. 1992)........................................................................... 14

*Players, Inc. v. City of N.Y.*,
  371 F.Supp.2d 522 (S.D.N.Y. 2005) ........................................................... 13

*Rush v. Obledo*,
  756 F.2d 713 (9th Cir. 1985) ................................................................. 11, 13

*Sears, Roebuck & Co. v. San Diego Cty. Dist. Council of Carpenters*,
  436 U.S. 180 (1978) ....................................................................................... 7

*Sec. & L. Enf't Emps v. Carey*,
  737 F.2d 187 ................................................................................................... 9

*United States v. Biswell*,
  406 U.S. 311 (1972) ............................................................................... 13

*United States v. Garcia*,
  56 F.3d 418 (2d Cir. 1995) ...................................................................... 9

*United States v. Gordon*,
  655 F.2d 478 (2d Cir. 1981) .................................................................... 9

*United States v. Kolokouris*,
  2015 WL 4910636 (W.D.N.Y. Aug. 14, 2015) .................................... 11

*United States v. Munsingwear, Inc.*,
  340 U.S. 36 (1950) ................................................................................... 4

*United States v. Watkins*,
  940 F.3d 152 (2d Cir. 2019) .................................................................... 5

*V–1 Oil Co. v. State of Wyo. Dep't of Env. Quality*,
  902 F.2d 1482 (10th Cir. 1990) ............................................................ 13

*Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould, Inc.*,
  475 U.S. 282 (1986) ................................................................................. 4

*Wisconsin v. Mortier*,
  501 U.S. 597 (1991) ............................................................................. 5, 6

## Statutes, Rules, and Other Authorities

7 U.S.C § 136v(a) ............................................................................................ 6

29 U.S.C. § 151 ............................................................................................... 4

29 U.S.C. § 504 ............................................................................................... 5

29 U.S.C. § 523 ........................................................................................... 5, 6

29 U.S.C. § 524a .......................................................................................... 5, 6

N. J. Stat. § 5:12-93(a) ................................................................................... 7

N.Y. Const. art. 1, § 12 ................................................................................ 14

N.Y. Const. art. 1, § 17 .................................................................................. 8

N. Y. Penal Law § 460.10 .............................................................................. 8

N. Y. Correct. Law Art. 23-A § 753(a) ........................................................................... 8

N.Y.C. Admin. Code § 10-303(c) ................................................................................... 10

N.Y.C. Admin. Code § 10-303(e) ................................................................................... 10

N.Y.C. Admin. Code § 16-503 .......................................................................................... 2

N.Y.C. Admin. Code § 16-505(d)(iii) ............................................................................. 10

N.Y.C. Admin. Code § 16-509(g) ................................................................................ 8, 12

N.Y.C. Admin. Code § 16-515 .......................................................................................... 9

N.Y.C. Rules Tit. 17 § 2-03 ............................................................................................... 2

N.Y.C. Rules Tit. 17 § 2-04(d)(2) ..................................................................................... 9

## PRELIMINARY STATEMENT

Congress enacted the National Labor Relations Act (the "NLRA") in the depths of the Great Depression to protect workers from powerful companies and the industry-captured municipalities that empowered them.[1]  The NLRA established a uniform regime of federal labor law to, among other things, prevent localities from entrenching politically-favored unions.  As it was put to Congress at the time, the NLRA would "challenge and destroy [a] new feudalism in America" where there are "hundreds and hundreds of communities in the United States where the plant owner decides who is going to rule the town" and "which workingman is going to work," and where "trade unionism hasn't got a chance."[2]

Local Law 55 (the "Ordinance") exemplifies the evil that the NLRA was intended to prevent (*i.e.*, local political elites picking and choosing which unions are allowed to thrive and which are forced out), and illustrates the danger of regulating unions based on "local procedures and attitudes toward labor controversies." *NLRB v. Nash-Finch Co.*, 404 U.S. 138, 144 (1971). The City claims that the Ordinance purportedly is necessary to further its "interest in reducing corruption and racketeering" in the carting industry, emphasizing corruption in the construction and demolition ("C&D") sector.  Opp. 1-2.  The facts, however, belie that this is its primary goal.

Over the past twenty years, the Business Integrity Commission ("BIC") rejected registration applications by over 130 C&D carting companies[3] to "combat[] the influence of organized crime and prevent[] its return to" the C&D carting industry.[4]  Despite this history, in

---

[1] *See* Declaration of Robert J. Anello, dated December 3, 2021 ("Anello Decl."), ¶ 4 and Ex. 3 attached thereto (March 20, 1934 statement of Stephen Raushenbush before the Senate Committee Hearing on Education and Labor, at 287, testifying that "government police, in this case privately paid by the companies, but commissioned by the various county governments, were carrying out the will of the men trying to keep out real unions").
[2] *See* Anello Decl. ¶ 5 and Ex. 4 attached thereto (March 21, 1934 statement of William Karlin before Senate Committee on Education and Labor, at 300).
[3] *See* Anello Decl. ¶ 3 and Ex. 2 attached thereto.
[4] *See* Anello Decl., ¶ 2, and Ex. 1 attached thereto (BIC Decision Denying Renewal Application of Emerald Carting, dated January 19, 2021).

July 2021, at the eleventh hour, demonstrating the kind of political influence that was a driving factor leading to Congress enacting a national scheme to regulate unions, the City *exempted unions with workers in C&D removal* from the Ordinance, including Teamsters Local 282, a union that represents only C&D carters.[5]   Although the City continues to regulate C&D carters,[6] the City Council did not explain the exemption for unions in the notorious C&D space.[7]   Thus, the City succumbed to precisely the political favoritism that the NLRA was enacted to eliminate.

If the Ordinance stands, local political horse-trading and favoritism will spread within and without the City.   Tens of thousands of local governments[8] could follow the City's lead and impose their preferred rules on union officials.   Like the Ordinance, the laws will reflect local political preferences and "attitudes toward labor controversies," *Nash-Finch Co.*, 404 U.S. at 144, which will be "catastrophic" for the "uniformity of national labor law."   *Loc. 399 v. Lincolnshire*, 905 F.3d 995, 1005 (7th Cir. 2018).   Local laws will give politically-connected unions an edge, allowing municipalities—rather than workers—to select workers' collective bargaining agents.   The City's brief entirely ignores this point.   Opposition ("Opp.") 6-10.

In addition, the Opposition does not credibly dispute that the Ordinance imposes an unprecedented burden on Local 339 and its officers.   Officers must execute an onerous release (the "Release") that authorizes the City, for a period of *five years*, to obtain *any and all*

---

[5] The City amended the Ordinance to remove from BIC's jurisdiction "labor unions or labor organizations that represent or seek to represent employees directly involved only in the collection, removal, transportation or disposal of one or more of the following: non-putrescible waste, including construction and demolition debris."   N.Y.C. Admin. Code Tit. 16 § 16-503.

[6] C&D carters must register with the BIC.   *See* N.Y.C. Rules Tit. 17 § 2-03 (describing "Class 2 Registration" for C&D carters).

[7] Councilmember Antonio Reynoso merely stated that Local Law 55 was intended "to address issues of company-controlled unions in the putrescible waste industry" but not the C&D industry.   Public Hearing of the Committee on Sanitation and Solid Waste Management of the New York City Council (June 17, 2021) (statement of Councilmember Antonio Reynoso at recorded hearing), https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=872102&GUID=A1DEE69E-00A2-4000-B4A6-6CBD5754ED54&Options=ID|Text|&Search=putrescible (last visited October 27, 2021).

[8] According to the U.S. Census Bureau, there are over 90,000 local government entities across the country. *See* https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html (last visited October 27, 2021).

*information* "pertaining to the [union] and/or its officers" from *any source.* Barry Decl., Exs. B at 13, and C at 7. The City can search a union official's internet search history, phone records, and more—with no limitations. The City can undertake these searches *in secret*, without giving union officials an opportunity to object, and the City has little accountability. *Id.*[9] In addition, the Ordinance bars union officials from interacting with their members, and thereby, in the words of a recent federal court decision, "prevent[s] the Union from functioning as the employee's collective bargaining representative in violation of the NLRA." *NLRB v. Virgin Islands Casino Control Commission*, No. CV 2020-0007, 2021 WL 4990628, at *14 (D.V.I. Oct. 27, 2021).

For the reasons set forth in Local 339's moving brief and below, Local 339 has demonstrated a strong likelihood that the Ordinance, BIC's implementing rules, and the Release are preempted by federal labor law and violate federal and state constitutional protections, as well as the New York City Administrative Procedures Act ("CAPA"). Because Local 339 and its members face the threat of irreparable injury, and the *status quo* poses no prejudice to the City, the Court should preliminarily enjoin the Ordinance, its implementation, and the Release.

## I.    The Ordinance Is Preempted By the NLRA

### A.    The Preemption Carveouts in the LMRDA Do Not Apply To Municipalities

As noted above, the City does not dispute that local regulation of unions would be "catastrophic" for "the uniformity of national labor law" and create an "administrative nightmare." *Lincolnshire*, 905 F.3d at 1005. The City does not even try to rebut the Seventh Circuit's reasoning in *Lincolnshire*. Instead, the City argues that the Court should ignore *Lincolnshire* because the decision was vacated by the Supreme Court as moot. Opp. 6. While the decision was pending before the Supreme Court, Illinois passed a law barring municipalities

---

[9] The union and its officials must "waive all liability as to" the City for damages resulting from the Release, except for harm resulting from "willful, unlawful" disclosure. Barry Decl., Exs. B at 13, and C at 7.

from regulating unions on the subject at issue in *Lincolnshire*.  The City argues that Illinois's law "casts doubt" on "the legislature's confidence" in the Seventh Circuit's reasoning.  *Id.*  On the contrary, the Illinois law demonstrates that the State *agreed* with the Seventh Circuit and recognized the danger posed by local regulation of unions.  Moreover, because the Supreme Court typically vacates an appellate decision that becomes moot before an adjudication on the merits, the vacatur of the Seventh Circuit's decision in no way calls into question its analysis.[10]

Relying on precedent *outside the labor context*, the City argues that insufficient evidence exists that "Congress sought to supplant local authority."  Opp. 9.  The Supreme Court, however, holds that Section 7 is intended to do just that.  "[T]he purpose of the [NLRA] was to obtain uniform application of its substantive rules and *to avoid the diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies*."  *Nash-Finch Co.*, 404 U.S. at 144 (emphasis added).[11]  Accordingly, preemption is the default position under Section 7.  Absent the preemption carveouts in the Labor Management Disclosure and Reporting Act ("LMRDA"), the Ordinance would clearly be preempted by the right of workers to "bargain collectively through representatives of their own choosing."  29 U.S.C. § 151.[12]

Thus, the issue here is not whether Congress "supplant[ed] local authority," Opp. 9, but whether Congress intended to *restore* authority to municipalities through carveouts that apply to "States."  Congress plainly did not.  First, regulation of unions by municipalities would create a "crazy-quilt of regulations" that would be anathema to the "uniformity of national labor law." *Lincolnshire*, 905 F.3d at 1005, and, as the overbreadth of the Release demonstrates, unworkable

---

[10] *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 40-41 (1950).

[11] *See also Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould, Inc.* 475 U.S. 282, 286 (1986) ("It is by now a commonplace that in passing the NLRA Congress largely displaced state regulation of industrial relations.").

[12] *See Brown v. Hotel Emps. v. Nevada Gaming Comm'n*, 468 U.S. 491, 504-05 (1984) ("As originally enacted. . . . § 7 imposed no restrictions whatsoever on employees' freedom to choose the officials of their bargaining representatives.").

and burdensome.  As the City's last-minute C&D exemption demonstrates, local regulation would also empower localities to favor politically-connected unions.

Second, the text and legislative history of the LMRDA preemption carveouts, Sections 523 and 524a, come nowhere near showing that Congress intended to create a nation-wide "crazy-quilt" of union regulations.  *Id.* at 1005.  Both provisions empower "States"—not localities.  The LMRDA repeatedly pairs the word "State" with both "political subdivision" and "local," which shows that a standalone reference to "State" does not include localities.[13] Moreover, the legislative of history of both LMRDA carveouts shows that Congress was concerned with State laws—not municipal laws.[14]  In sum, the plain language of Sections 523 and 524a, read in the context of the NLRA and LMRDA as a whole, demonstrates that Congress did not intend to empower tens of thousands of municipalities to regulate union officials.

### B.    Neither the *Mortier* Nor *Ours Garage* Decisions Mandate the Conclusion that the Ordinance Falls Within a Preemption Carveout

As the Seventh Circuit explained in *Lincolnshire*, 905 F.3d at 1006-08, the City's reliance on Supreme Court cases that do *not* involve the federal labor statutes does not change the analysis.[15]  The meaning of the word "State" in the LMRDA preemption carveouts "depends upon the character and aim of the specific provision involved."[16]  Further, "identical language may convey varying content *when used in different statutes*."[17]  Thus, neither *Mortier* nor *Ours Garage* establishes a bright-line rule that "State" regulation includes municipal regulation.

---

[13] *See* Local 339 Brief ("Br.") 14 n. 12 (examples); *see also* 29 U.S.C. § 504 (referencing a "State *or local* offense" in the federal disqualification regime) (emphasis added).

[14] *See* Anello Decl. ¶ 6 and Ex. 5 attached thereto (extensive Senate floor debate on 523(a) focused exclusively on application of the carveout to State laws, with no mention whatsoever of local laws); Anello Decl. ¶ 7 and Ex. 6 attached thereto (House floor debate on 524a discusses the impact of the carveout only on State laws, with no reference to local laws).

[15] Opp. 7-10 (discussing *Wisconsin v. Mortier*, 501 U.S. 597 (1991) and *Columbus v. Ours Garage*, 536 U.S. 424 (2002)).

[16] *District of Columbia v. Carter*, 409 U.S. 418, 420 (1973).

[17] *United States v. Watkins*, 940 F.3d 152, 165 (2d Cir. 2019) (emphasis added).

*Lincolnshire*, 905 F.3d at 1006.  On the contrary, the "character and aim" of the provisions in those cases demonstrates that Sections 523 and 524a stand on a completely different footing.

*Mortier* is inapposite because it does not even involve a preemption carveout.  In that case, the issue was whether Section 136v(a)'s reference to "State" authority serves as the *source* of preemption based on the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA").[18]  In the absence of Section 136v(a), "localities would still be free to regulate" pesticides.  *Mortier*, 501 U.S. at 607.  In the context of pesticides, the presumption is that municipalities have broad regulatory authority.  *Mortier* simply held that Section136v(a) is insufficient to show a "clear and manifest purpose of Congress" to overcome that presumption.  *Id.* at 610.

Sections 523 and 524a, by contrast, are *exceptions* to the well-established preemptive effect of Section 7 of the NLRA.  To apply *Mortier* to the LMRDA preemption carveouts would turn the preemptive effect of the NLRA on its head.  Additionally, *Mortier* determined that FIFRA specifically contemplated pesticide-related enforcement *by municipalities*.[19]  Nothing in the NLRA or LMRDA contemplates the local regulation of unions.

*Ours Garage* likewise addressed a statute with a very different "character and aim" than Sections 523 and 524a.  *Carter*, 409 U.S. at 420.  Initially, the Court analyzed the specific "set of [preemption] exceptions" at issue, which have "no corollary" in the labor laws.  *Lincolnshire*, 905 F.3d at 1008.  Importantly, the carveout in *Ours Garage* addressed a subject (roadway safety) where "States have traditionally allowed localities to address local concerns," which "typically includes the choice to delegate the State's 'safety regulatory authority' to localities."[20]

---

[18] *See Mortier*, 501 U.S. at 607 (Section 136v(a)'s reference to "State" authority was "insufficient to demonstrate the necessary congressional intent to preempt"); *Lincolnshire*, 905 F.3d at 1007 ("the first question in *Mortier* was whether FIFRA had any preemptive effect at all").

[19] *See Mortier*, 501 U.S. at 615 (FIFRA "implies a regulatory partnership between federal, state, *and* local governments") (emphasis in original).

[20] *Ours Garage*, 536 U.S. at 439.

As the Seventh Circuit recognized, "federal labor laws . . . are a different matter altogether." *Lincolnshire*, 905 F.3d. at 1007.  States do not "typically" delegate to municipalities the authority to regulate union officer qualifications because the NLRA places "great weight on uniformity." *Id.* at 1005.  In addition, the extension of the carveout in *Ours Garage* to local *safety* regulations did not undercut the main thrust of the statute at issue—*i.e.*, the *economic* regulation of motor carriers.[21]  Here, the Ordinance targets central concerns of the NLRA: workers' ability to select representatives and union officials' ability to represent their members.

### C. Section 7 of the NLRA and Section 17 of the New York State Constitution Preempt the Ordinance Even If the LMRDA's Preemption Carveouts Apply to Municipalities

The City's assertion that *Brown* upheld a "nearly identical" regulatory regime, Opp. 20, is incorrect.[22]  In *Brown*, the state agency could require a union to "**disclose such information to the division as the division may require.**"  Opp. 19 (citing N.J. Stat. § 5:12-93(a)) (emphasis in original).  The City's Release goes miles farther.  It applies to every officer. *See* Barry Decl., Exs. B at 13, and C at 7.  It applies to all information held by third parties. *Id.*  It empowers BIC to conduct unlimited searches for five years, in secret, and without any opportunity to object. *Id.*

Additionally, the Ordinance prevents union officials from *associating with their own members who have criminal records*, such that the officers cannot fulfill the union's duty of fair

---

[21] *See Lincolnshire*, 905 F.3d at 1008 (explaining that the Interstate Commerce Act "primarily concerned itself with economic regulation" and thus "[m]unicipalities could legislate on [safety regulations] without directly offending the statute's central goals").

[22] The City's argument that *Garmon* preemption's stringent "arguably protected" standard is inapplicable because the Ordinance does not implicate the "primary jurisdiction" of the NLRB ignores the second branch of *Garmon* preemption.  Opp. 11. "The danger of state interference with federally protected conduct is the principal concern of the second branch of the *Garmon* doctrine." *Sears, Roebuck & Co. v. San Diego Cty. Dist. Council of Carpenters*, 436 U.S. 180, 203 (1978).  That branch applies when "exercise of state jurisdiction" creates a "risk of misinterpretation of federal law." *Id.*  Contrary to the City's argument, the Second Circuit has explicitly applied *Garmon* preemption even when "there is no threat to the NLRB's primary jurisdiction." *Healthcare Ass'n of New York State, Inc. v. Pataki*, 471 F.3d 87, 101 (2d Cir. 2006).  Given the expansive sweep of the Ordinance and Release, they plainly pose a risk that City officials with misinterpret the bounds of Section 7 rights.

representation as to those members.  Br. 19-20.  Workers with criminal records—"second chancers"—are common in the carting industry, and compromise at least 10% of Local 339's carters in New York City.  Barry Decl., ¶ 5; Supp. Barry Decl. ¶¶ 3, 5.[23]  Moreover, New York State policy is "to encourage the [] employment of persons previously convicted of [] criminal offenses."[24]  Yet the City cannot explain how Local 339's officials could possibly represent second chancers under the Ordinance. Opp. 12-20.[25]  More broadly, Local 339 officials serve multiple roles within USWU (*e.g.*, business agent), which could require them to work with any of USWU's over 20,000 members.  The Ordinance's "association" prohibitions would operate as a tripwire precluding Local 339 officials from doing their jobs. *See* Supp. Barry Decl. ¶¶ 6-13.

Thus, the Ordinance "prevent[s] [Local 339] from performing its functions as the employees' chosen collective-bargaining agent."  *Brown*, 468 U.S. at 511.  Although the LMRDA carveouts "preserve some room" for regulating union officials, *id.* at 506, they do not give States a blank check.[26]  States may regulate only within "reasonable limits."[27]  If the Ordinance and Release do not exceed those limits, nothing does.[28]

---

[23] *See also* Kevin Flynn, "NYC's private waste industry has been the Second Chance program the City doesn't have," Brooklyn Daily Eagle (December 5, 2018) ("New York's private carting industry employs hundreds of people like me with limited education and a criminal record, giving us the second chance to work hard, regain our dignity and support ourselves and our families.").

[24] N. Y. Correct. Law Art. 23-A § 753(a) (2014).

[25] The Ordinance provides that a union officer may be disqualified if he has "associated with a person convicted of racketeering activity," or "associated with any member or associate of an organized crime group."  NYC Admin. Code § 16-509(g)(iv)-(v).  The Ordinance defines "racketeering activity" broadly to encompass all offenses listed in the federal RICO statute and New York enterprise corruption laws. *Id.*  These offenses include low-level crimes that have little connection to organized crime, such as criminal mischief in the third degree (damaging another's property in an amount exceeding $250) and larceny in the fourth degree (stealing property worth $1,000).  *See* NY Penal Law § 460.10.

[26] In fact, *Brown* remanded for findings of fact to determine whether the penalties posed by the regulation went too far and incapacitated the operation of the plaintiff union.  *Id.*, 468 U.S. at 511.

[27] *Hotel Emps. v. Nevada Gaming Comm'n*, 984 F.2d 1507, 1516 (9th Cir. 1993).

[28] For the same reasons, the Ordinance violates Section 17 of the New York State Constitution.  The sole case relied on by the City regarding Section 17, *Int'l Longshoremen's Ass'n v. Waterfront Com.*, 16 Misc. 2d 632 (Sup. Ct. 1958), states that Section 17 does not prevent a state from banning "ex-felons" from serving as union officials.  *Id.* at 635.  Again, the Ordinance and the Release go much further.

## II.     The Release Violates the United States and New York State Constitutions

### A.     Local 339 and Its Officers Have a Constitutionally-Protected Privacy Interest In Information Subject To the Release

The City makes the far-fetched argument that Local 339 and its officers have no expectation of privacy in information subject to the Release because they "consent" by signing it. Opp. 22.  Second Circuit precedent holds otherwise.  Under the Fourth Amendment, a "valid" consent must be "a product of that individual's free and unconstrained choice."  *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995).  No "effective consent" exists where "one is given a choice between one's employment and one's constitutional rights."  *Anobile v. Pelligrino*, 303 F.3d 107, 123-24 (2d Cir. 2002).[29]  Because union officials are constrained to sign the Release to keep their jobs and avoid penalties, the Release must withstand Fourth Amendment scrutiny.

### B.     The Release Is an Administrative Search

The City argues that the Release is not an administrative search because it does not impose ongoing reporting and civil or criminal penalties.  Opp. 24-25.  The City is wrong on both the law and the facts.  An administrative search is "made for the purpose of inventory or administrative regulation," *Anobile*, 303 F.3d at 122, which readily describes the Release.[30] Moreover, the City cites no authority for the proposition that an administrative search *requires* recurring searches or penalties.  Opp. 24, 26-27.  Indeed, the Second Circuit applies the administrative search doctrine to regulations that have no penalties.[31]  In any event, and contrary to the City's assertions, the Ordinance requires recurring reporting and imposes penalties.[32]

---

[29] *See also Sec. & L. Enf't Emps v. Carey*, 737 F.2d 187, 202 n. 23 (2d Cir. 1984) (rejecting argument that corrections officers consented to searches by accepting employment).

[30] *See* N.Y.C. Rules Tit. 17 § 2-04(d)(2) (each union representative must submit to a "background investigation").

[31] *See Palmieri v. Lynch*, 392 F.3d 73, 78-79, 85-86 (2d Cir. 2004); *United States v. Gordon*, 655 F.2d 478, 482-84 (2d Cir. 1981).

[32] Specifically, a union officer who remains in his position without signing the Release is subject to a penalty of up to $10,000 for violating the Ordinance.  *See* N.Y.C. Admin. Code § 16-515.  Further, the Ordinance requires unions

Finally, the City's comparison of the Release to the City's handgun "licensing regime," Opp. 25, does not get around the administrative search doctrine.  Licensing regimes trigger Fourth Amendment scrutiny.[33]  If anything, the City's comparison of the Release to the City's handgun regulations underscores the incredible overbreadth of the Release.[34]

### C.    The Release Is Unconstitutional Because It Does Not Provide an Opportunity for Pre-Compliance Review

The City does not dispute that an administrative search generally requires pre-compliance review.  *See* Br. 25-27; Opp. 22-29.  Rather, the City argues that *this lawsuit* provides the requisite pre-compliance review.  Opp. 29, 29 n. 12.  The pre-compliance review requirement, however, applies to *each search* pursuant to an administrative regime—not the regime itself.[35] Indeed, this District has already specifically rejected the City's argument. *See Airbnb, Inc. v. City of N.Y*, 373 F.Supp.3d 467, 494 (S.D.N.Y. 2019).  Accordingly, the Release is unconstitutional because it denies unions and union officials the requisite opportunity for pre-compliance review.

### D.    The Closely Regulated Industry Exception Does Not Apply, And Even If It Does, the Release Is Unconstitutional Because It Has No Time, Place, or Scope Limitations

The City argues that the Release falls within the closely regulated industry exception, and that it meets the narrow tailoring requirements of that exception.  The City is wrong on both

---

to report "any material change in the information reported pursuant to [§ 16-505] . . . within 10 business days," N.Y.C. Admin. Code § 16-505(d)(iii), which requires recurring reporting to BIC *(e.g.*, every time Local 339 receives a government subpoena).  *See* Barry Decl., Ex. C  at 1. (changes to information on the union and union officer disclosure form must be updated within ten days).

[33] *See Anobile*, 303 F.3d at 123-25 (Fourth Amendment applied to licensing regime); *Chalfy v. Turoff*, 804 F.2d 20, 23 (2d Cir. 1986) (same).

[34]  Unlike BIC's searches pursuant to the Release, the background search for a handgun application is limited *to statements made in the application* and conducted one time, without future searches.  *See* 10 N.Y.C. Admin. Code § 303(c) ("Before a permit is issued or renewed, the police department shall investigate all statements required in the application."); *id.* § 303(e) ("Upon completion of the investigation . . . the commissioner shall issue the permit or shall notify the applicant of the denial of the application and the reason or reasons therefor.").

[35] *See City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 420 (2015) ("[A]bsent . . . exigent circumstances . . . for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker.").

counts.  The closely regulated industry exception is a "narrow exception," *Patel*, 576 U.S. at 410, that applies to "'closely regulated' industries 'long subject to close supervision and inspection.'" *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978).  The exception is limited to industries with a "history of government oversight" such that "no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise," and "when an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to" strict regulation.  *Id.*

Even if carting were a closely regulated industry, *unions and union officers that represent carting workers* do not fall within the exception.  A union is not akin to a "proprietor" or "entrepreneur" who directly participates in an industry and thereby reasonably expects close government oversight.  Local 339 and its officers represent approximately 1,400 workers in *multiple industries*—including over 1,000 workers who do construction, clerical, or other work unrelated to carting.  Supp. Barry Decl., ¶¶ 3-4.  The closely regulated industry exception does not apply to "regulatory schemes which indiscriminately cover[] many different businesses." *Rush v. Obledo*, 756 F.2d 713, 718 (9th Cir. 1985).[36]  Tellingly, the City does not cite a single case applying the closely regulated industry exception to a union—let alone a union representing mostly workers in industries that are *not* closely regulated.

Even if the closely regulated industry exception applies here, the exception does not save the Release.  To pass muster under the exception, an administrative search must be: (1) informed by a "substantial government interest"; (2) "necessary to further the regulatory scheme"; and (3) conducted pursuant to a statutory scheme that provides "certainty and regularity" in its application so as to "provide a constitutionally adequate substitute for a warrant."  *New York v.*

---

[36] *See also United States v. Kolokouris*, No. 12-CR-6015G, 2015 WL 4910636, at *21 (W.D.N.Y. Aug. 14, 2015) (approving proposition that the closely regulated industry exception does not apply to regimes applicable "both to closely regulated and not closely regulated industries").

*Burger*, 482 U.S. 691, 702-03 (1987).  To satisfy the third prong, the search regime must be "*carefully limited in time, place, and scope.*"  *Id.* at 703 (emphasis added).  The Release fails the second and third prongs of this standard.

Starting with the third prong, the Release provides no time, place, or manner restrictions whatsoever.  The City perfunctorily asserts that the Release is "defined in scope" because the Ordinance's purported focus "on combating organized crime and racketeering . . . limits official discretion."  Opp. 28.  Yet the City cites *nothing* in the Release, the Ordinance or BIC's regulations limiting the scope of searches conducted pursuant to the Release.  *Id.*  Nor could it.  The Release states that BIC will "conduct an investigation" into whether the union and union officers "meet the registration standards" in the Ordinance.  Barry Decl., Exs. B at 13, and C at 7.  The disqualification "standards" in the Ordinance, however, are vague and open-ended, and provide no guidance as to the scope of an appropriate search.

BIC may disqualify an officer based on a laundry list of past crimes without regard to any organized crime relationship, *associating* with persons convicted of such crimes, or *associating* with a person who is "a member *or associate*" of an "organized crime group," as identified by any law enforcement agency.  NYC Admin. Code § 16-509(g).  BIC will determine "if there are sufficient grounds to disqualify a person," and may bear in mind the officer's "good character, honesty, and integrity."  *Id.*  Furthermore, the Release authorizes BIC to search *anywhere* for information regarding an officer's qualifications.[37]  Thus, BIC has unfettered discretion to probe an officer's conduct and associates—and even the associations of *those associates*—in secret for five years to determine whether he is connected to criminal activity and/or has a good character.

Because the Release has no limitations and empowers officials with "unbridled

---

[37] BIC may obtain information from "any federal, state, local, or foreign government or agency, any private . . . entity, and/or any individual in his or her personal or professional capacity." Barry Decl., Exs. B at 13, and C at 7.

discretion," *Barlow's Inc.,* 436 U.S. at 323, it violates the Fourth Amendment.  An avalanche of case law holds that an overbroad administrative search is unconstitutional.[38]  Case law outside the Second Circuit makes the same point.[39]  By contrast, the City does not cite a single case approving an administrative search that is comparable to the Release.  Not one.  *See* Opp. 27-28.

Turning to the second prong of the closely regulated industry standard, the Release is also unconstitutional because it is not "necessary to further the regulatory scheme." *Burger*, 482 U.S. at 702.  A warrantless search is necessary when the search requires an element of surprise to be effective.  *See United States v. Biswell*, 406 U.S. 311, 316 (1972) (warrantless searches permissible because obtaining a warrant "could easily frustrate inspection").[40]  Here, the Release authorizes BIC to obtain records from third parties that are beyond the control of union officers.  Thus, pre-compliance review would not permit a union officer to obstruct BIC's investigation.

In sum, the Release is not limited in time, place or scope, and it is not necessary to preserve an element of surprise.  It therefore cannot be saved by the closely regulated industry

---

[38] *See Patel,* 576 U.S. at 410 ("[the municipal code provision] is also constitutionally deficient ... because it fails sufficiently to constrain police officers' discretion as to which hotels to search and under what circumstances"); *Anobile*, 303 F.3d at 120 (regulatory scheme that failed to properly limit place of searches was unconstitutional); *Gem Financial Svc., Inc v. City of N.Y.*, 298 F.Supp.3d 464, 497 (E.D.N.Y. 2018) (regulatory schemes are unconstitutional when they "provide[] no meaningful limitation on the discretion of inspecting officers," and allow the government to "examine any and all records, whether required to be kept by a valid regulatory scheme or not, [and] access the entirety of the premises"); *EZ Pawn Corp. v. City of New York*, 390 F. Supp. 3d 403, 420 (E.D.N.Y. 2019) (finding an administrative search regime may be unconstitutional (at the summary judgment stage) when it "does not even purport to limit authorized searches to 'reasonable times,'" but rather "empowers . . . officers to inspect. . . as irregularly or inconsistently as they choose").

[39] *See V–1 Oil Co. v. State of Wyo. Dep't of Env. Quality,* 902 F.2d 1482, 1487 (10th Cir. 1990) (state statute did not provide a constitutionally adequate substitute for a warrant where it left "inspectors free to inspect any business as often or seldom as he or she pleases"); *Allinder v. State of Ohio*, 808 F.2d 1180, 1188 (6th Cir.) (statute permitting warrantless inspections unconstitutional where it did not provide "certainty, regularity and fairness," was "ripe for potential abuse," and did not "tailor the scope and frequency of such administrative inspections to the particular purpose" of the statute) (internal quotations omitted); *Rush*, 756 F.2d at 721 (statute authorizing warrantless inspection of family day care homes unconstitutional because it failed to limit the inspector's discretion; it permitted inspections at any time, day or night and did not limit the inspection to "those portions of the provider's home where day care activities take place").

[40] *See also Burger*, 482 U.S. at 710 (warrantless searches permissible where surprise necessary for "regulatory scheme . . . to function at all"); *Players, Inc. v. City of N.Y.,* 371 F.Supp.2d 522, 538 (S.D.N.Y. 2005) (enforcement of the smoking ban in indoor dining establishments required the element of surprise because "violators could frustrate the [objective of the search] by taking temporary remedial measures").

13

exception and violates the Fourth Amendment.[41]

### E.    The Release Violates Local 339's First Amendment Freedom of Association

The Release also violates union members' First Amendment right to choose their own representatives.  Several months ago, the Supreme Court held for the first time that *all compelled disclosure regimes* are subject to "exacting scrutiny."  *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384 (2021).  Exacting scrutiny "requires that there be a substantial relation between the disclosure requirement and a sufficiently important governmental interest."  *Id.* at 2385.  The disclosure requirement must be "narrowly tailored to the interest it promotes."  *Id.*[42]

Local 339's right to freedom of association "encompasses the right of union members to select their representatives."  *Local 186. v. Brock*, 812 F.2d 1235, 1237 (9th Cir. 1897).[43]  The Release is a compelled disclosure regime that interferes with that right, and deters qualified persons from serving as union officials, which triggers exacting scrutiny. *See Americans for Prosperity Found.*, 141 S. Ct. at 2388 (exacting scrutiny is "triggered by state action, which *may* have the effect of curtailing the freedom to associate") (emphasis added).  Because the Release has no tailoring—let alone narrow tailoring—it fails exacting scrutiny and is unconstitutional.

## III.    The Release Violates the New York City Administrative Procedure Act

The City argues that the Release complies with CAPA because it is an "extension[] of

---

[41] Even if the Release somehow passed muster under the Fourth Amendment, it would still violate Article 1, Section 12 of the New York Constitution, which affords "greater protection" against warrantless searches and ensures that the administrative search exception applies to "narrowly circumscribed situations." *People v. Keta*, *sub nom. People v. Scott*, 79 N.Y.2d 474, 492, 501 (N.Y. 1992).  The Release is not "narrowly circumscribed." *Id.*  Indeed, the City fails to explain how the Release can satisfy this heightened standard.  Opp. 30.

[42] In *Americans for Prosperity*, the Court rejected as insufficiently tailored a law requiring charities to disclose certain donor information, even though it acknowledged that the state had a "substantial governmental interest" in protecting the public from charitable fraud.  *Id.* at 2386; *see also Kissel v. Seagull*, 2021 WL 3088037, at * 12 (D. Conn., July 21, 2021) (holding that a plaintiff's challenge to a statute compelling disclosure of donor information had a substantial likelihood of success because it was "not narrowly tailored to serve a compelling purpose").

[43] *See also Bhd. of R.R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1, 6 (1964) (recognizing that "the right of members to select a spokesman from their number who could be expected to give the wisest counsel").

14

BIC's rules" and "facilitate[s] compliance."  Opp. 31, 32 n. 14.  No "extension" exception applies to CAPA, however.  If a procedure is mandatory, uniform, and dispositive of an outcome, it is a rule.  *See Council of City of New York v. Dep't of Homeless Servs.*, 22 N.Y.3d 150, 154 (N.Y. 2013).  The Release is all of these things and therefore it constitutes a rule under CAPA.

**IV.    Local 339 Has Demonstrated that It Will Suffer Irreparable Harm and the Balance of the Equities and Public Interest Favor a Preliminary Injunction**

The Ordinance and Release pose a threat of irreparable harm based on the disclosure of the union and its officers' personal information, the violation of their constitutional rights and the impairment of Local 339 as a collective bargaining agent.  Br. 32.  Union officers would be deterred from serving and unable to fulfill Local 339's duty of fair representation to members with criminal histories, and their other duties within USWU.  *Id.* at 33; *see supra* 7-8.  The City's only response is that Local 339 cannot establish irreparable injury because its claims are unlikely to succeed.  Opp. 33-34.  Thus, the City concedes that, if Local 339 establishes a likelihood of success on the merits (which it has), it will also establish a threat of irreparable injury.

The City has no "immediate interest" in enforcing the Ordinance, Opp. 34, because the City held it in abeyance for 21 months, and did not regulate unions in the trade waste space until 2019. Br. 33-34.  Moreover, the City does not dispute that it can effectively respond to criminal activity through the usual channels.  Br. 34; Opp. 34.  Thus, the balance of equities favors a preliminary injunction.

<u>**CONCLUSION**</u>

The Court should grant a preliminary injunction to Local 339, and enjoin BIC from enforcing the Ordinance, its rules, and the Release for the duration of this lawsuit.

15

Date:   New York, New York
        December 3, 2021

                                        MORVILLO ABRAMOWITZ GRAND
                                        IASON & ANELLO P.C

                                        By:    */s/ Robert J. Anello*
                                                Robert J. Anello
                                                Edward M. Spiro
                                                Curtis B. Leitner
                                                Bronwyn C. Roantree

                                        565 Fifth Avenue
                                        New York, NY 10017
                                        (212) 856-9600

                                        *Attorneys for Plaintiff United Service Workers*
                                        *Union Local 339, IUJAT*

16